## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                       **NO. 15-61**

**LISA CRINEL, ET AL.**                          **SECTION: "E" (2)**

## ORDER AND REASONS

Before the Court are six post-trial motions filed by the Defendants[1] in this criminal matter with respect to all counts of conviction: (1) Defendant Shelton Barnes' Motion for Judgment of Acquittal and, in the Alternative for New Trial, and in the Further Alternative, to Arrest Judgment;[2] (2) Defendant Jonathon Nora's Motion for Judgment of Acquittal and, in the Alternative, for New Trial;[3] (3) Defendant Michael Jones' Renewed Motion for Judgment of Acquittal;[4] (4) Defendant Paula Jones' Motion for Acquittal, and, in the Alternative, Motion for New Trial;[5] (5) Defendant Henry Evans' Motion for Judgment of Acquittal, and Alternatively, Motion for New Trial;[6] and (6) Defendant Gregory Molden's Motion for Acquittal, and in the Alternative for New Trial, and in the Further Alternative, to Arrest Judgment.[7] The Government opposes the Defendants' post-trial motions.[8] Defendant Barnes filed a rebuttal memorandum.[9] In February 2018, the Defendants filed supplemental memoranda in support of their post-

---

[1] The six Defendants who were tried by jury are sometimes referred to collectively as the "Defendants."
[2] R. Doc. 1074.
[3] R. Doc. 1080. The Court granted Defendant Jonathon Nora's motion to adopt the motions filed by all co-Defendants. *See* R. Doc. 1217.
[4] R. Doc. 1085. The Court granted Defendant Michael Jones' motion to adopt the arguments made by Paula Jones in her Reply in Support of her Motion for Judgment of Acquittal. *See* R. Doc. 1169.
[5] R. Doc. 1087.
[6] R. Doc. 1102.
[7] R. Doc. 1455.
[8] R. Doc. 1147.
[9] R. Doc. 1168.

trial motions.[10] The Government filed an opposition to Defendants' supplemental memoranda.[11] Defendants Paula Jones and Henry Evans filed reply memoranda.[12]

For the following reasons, the Defendants' motions are **DENIED**.

<u>BACKGROUND</u>

On March 12, 2015, a federal grand jury returned a twenty-six-count Indictment against the Defendants and sixteen other co-defendant/co-conspirators, relating to their alleged roles in a conspiracy to defraud Medicare.[13] On April 21, 2016, the grand jury returned a Superseding Indictment that included most of the same charges as those in the original indictment but no longer included charges associated with defendants who had pleaded guilty by that time.[14] On September 8, 2016, the grand jury returned a forty-seven-count Second Superseding Indictment that included most of the same charges as those in the original and First Superseding Indictment, but no longer included charges associated with the defendants who had pleaded guilty by then.[15]

The Defendants were charged as follows in the Second Superseding Indictment. Defendants Henry Evans, Michael Jones, Paula Jones, Shelton Barnes, Gregory Molden, and Jonathon Nora were charged in Count 1, conspiracy to commit health care fraud, and Count 2, conspiracy to receive and pay illegal health care kickbacks.[16] Defendant Shelton Barnes also was indicted on Counts 3–7, individual counts of health care fraud relating to patient HaHa; Counts 8–11, relating to patient KiSt; Counts 11–17, relating to patient

---

[10] R. Docs. 1421, 1435 (Barnes), 1437 (Molden), 1438 (Michael Jones), 1439 (Paula Jones), 1440 (Evans), 1441 (Nora).
[11] R. Doc. 1445.
[12] R. Docs. 1450, 1452.
[13] R. Doc. 1.
[14] R. Doc. 484.
[15] R. Doc. 670, *as corrected by* R. Doc. 691.
[16] *Id.* at 8–12.

ArGi; and Count 47 relating to obstruction of a federal audit. Defendant Michael Jones was indicted on Counts 18–21, relating to patient ArGi; Count 22–26, relating to patient LiSc; and Count 27, relating to patient EvLa. Defendant Henry Evans was indicted on Counts 27 and 29, relating to patient JeJo; Counts 30 and 31, relating to patient JoWi; and Counts 43–46, relating to patient MaGr.[17]

Trial in this matter began on April 10, 2017. On May 9, 2017, after sixteen days of trial testimony and more than two days of deliberation, the jury convicted Defendants Shelton Barnes, Gregory Molden, Jonathon Nora, and Paula Jones on all counts for which they were charged in the Second Superseding Indictment.[18] Defendant Henry Evans was found not guilty as to as to Counts 1, 2, and 28–30, but was found guilty as to Counts 31 and 43–46. Defendant Michael Jones was found guilty as to Counts 1, 2, 18, and 22–27, and not guilty as to Counts 19, 20, and 21.

Following the verdict, Defendants Shelton Barnes, Jonathon Nora, Michael Jones, Paula Jones, and Henry Evans timely filed their post-trial motions pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.[19] On July 11, 2017, the Government filed its Omnibus Opposition to the Defendants' post-trial motions.[20] The Court held oral argument on the Defendants' motions on August 15, 2017.[21]

On February 5, 2018, the Court granted the Defendants' joint motion for leave to brief the Court on the applicability of the Fifth Circuit's recent decision in *United States*

---

[17] *Id.* at 30–32.

[18] R. Doc. 1067.

[19] The Government concedes that motions before the Court were timely filed. *See* R. Doc. 1147 at 4 ("After the verdict, all defendants re-urged their Rule 29 motions, which the Court Denied. *See* [R.] Doc. 1053. As indicated in the first paragraph, the instant motions were timely filed."). Defendant Gregory Molden filed his post-trial motion on March 29, 2018. R. Doc. 1455.

[20] R. Doc. 1147.

[21] R. Doc. 1188.

*v. Ganji* with regard the Defendants' convictions for conspiracy to commit health care fraud.[22] In *Ganji*, the Fifth Circuit found that the evidence at trial was insufficient to prove beyond a reasonable doubt that a defendant in that case, Dr. Ganji, entered into an agreement to defraud Medicare.[23] At the *Ganji* trial, the Government introduced indirect evidence of concerted action—doctors and nurses who spoke of their own fraudulent actions—but the Government elicited no testimony that any person agreed with Dr. Ganji to carry out these activities.[24] In addition, Dr. Ganji "provided extensive, undisputed testimony" of her innocence that was unrebutted by the Government.[25] The Fifth Circuit found that the Government "relied solely on inferences to support the fraud charge and attempted to use those same inferences to support a larger agreement," and, as a result, reversed the jury's verdict of guilty on the conspiracy to commit health care fraud charge.[26] The Fifth Circuit also reversed Dr. Ganji's conviction for health care fraud because the Government did not prove beyond a reasonable doubt that she knew patient Stewart was not homebound.[27]

The Defendants duly filed supplemental memoranda in support of their post-trial motions,[28] to which the Government responded.[29]

---

[22] R. Doc. 1423; *see United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018).
[23] *Ganji*, 880 F.3d at 770.
[24] *Id.*
[25] *Id.* at 771.
[26] *Id.* at 773.
[27] *Id.* at 778.
[28] R. Docs. 1421, 1435 (Barnes), 1437 (Molden), 1438 (Michael Jones), 1439 (Paula Jones), 1440 (Evans), 1441 (Nora).
[29] R. Doc. 1445.

## ANALYSIS

### I.    Motions for Judgment of Acquittal

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 "is a challenge to the sufficiency of the evidence to sustain a conviction."[30] When considering the sufficiency of the evidence, the court must determine whether "a rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt."[31] The court determines "only whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."[32] "[I]f the fact finder was presented with sufficient evidence to support the verdict reached, that verdict must be upheld."[33] "All reasonable inferences which tend to support the Government's case must be accepted. Any conflicts in the evidence must be resolved in the Government's favor."[34] Nevertheless, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."[35]

### A.   Count 1 – Elements of Conspiracy to Commit Health Care Fraud

To support a conviction for conspiracy to commit health care fraud under 18 U.S.C. § 1349, the Government must prove beyond a reasonable doubt that: "(1) two or more

---

[30] *United States v. Brown*, No. 10-291, 2012 WL 273163, at *2 (W.D. La. Jan. 26, 2012) (citing *United States v. Uvalle-Patricio*, 478 F.3d 699, 701 (5th Cir. 2007)); *United States v. Age*, No. 11-105, 2013 WL 3245215, at *1 (M.D. La. June 26, 2013) ("A Rule 29 motion for acquittal tests only the sufficiency of the evidence introduced at trial to support the crime charged.").

[31] *United States v. Miles*, 360 F.3d 472, 476 (5th Cir. 2004); *see also Age*, 2013 WL 3245215, at *1.

[32] *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995) (citations omitted).

[33] *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005); *see also United States v. Mack*, No. 15-61, 2016 WL 740280, at *1 (M.D. La. Feb. 24, 2016); *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995) ("The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence.").

[34] *United States v. Burns*, 597 F.2d 939, 940–41 (5th Cir. 1979) (citations omitted).

[35] *Ganji*, 880 F.3d at 767 (quoting *United States v. Pettigrew,* 77 F.3d 1500, 1521 (5th Cir. 1996)).

persons made an agreement to commit health care fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement . . . with the intent to further the unlawful purpose."[36] The Fifth Circuit has emphasized that the Government need not show direct evidence of the conspiracy. Rather, "each element may be inferred from circumstantial evidence."[37] Nevertheless, the Government must do more than "pile inference upon inference upon which to base a conspiracy charge."[38]

### B.  Count 2 – Elements of Conspiracy to Pay or Receive Health Care Kickbacks

The Anti-Kickback Statute provides,

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, . . . shall be guilty of a felony.[39]

More specifically, the law "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program."[40]

To prove a conspiracy to violate the Anti-Kickback Statute, the Government must show "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in

---

[36] *Id.* (quoting *United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015)).
[37] *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014).
[38] *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012).
[39] 42 U.S.C. § 1320a-7b(b)(2)(A) (2017).
[40] *Miles*, 360 F.3d at 479.

furtherance of the objective of the conspiracy."[41] The defendant must have "acted willfully, that is, with the specific intent to do something the law forbids."[42]

### C. Counts 3–46 – Elements of Medicare Fraud

To prove health care fraud in violation of 18 U.S.C. § 1347, the Government must show that the defendant knowingly and willfully executed "a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises," any health care benefit program's money in connection with the delivery of or payment for health care services.[43] As with conspiracy to commit health care fraud, health care fraud under § 1347 requires proof of knowledge and specific intent to defraud.[44] "However, this proof may be inferred from circumstantial evidence."[45]

### D. Count 47 – Elements of Obstruction of a Federal Audit

Count 47 charges Shelton Barnes with obstruction of a federal audit in violation of 18 U.S.C. § 1516. Section 1516 provides:

> Whoever, with intent to deceive or defraud the United States, endeavors to influence, obstruct, or impede a Federal auditor in the performance of official duties relating to a person, entity, or program receiving in excess of $100,000, directly or indirectly, from the United States in any 1 year period under a contract or subcontract, grant, or cooperative agreement . . . shall be fined under this title, or imprisoned not more than 5 years, or both.[46]

To prove obstruction of a federal audit, the Government must establish: (1) that the defendant endeavored to influence, obstruct or impede a federal auditor in the

---

[41] *United States v. Gibson*, 875 F.3d 179, 187–88 (5th Cir. 2017) (quoting *United States v. Njoku*, 737 F.3d 55, 64 (5th Cir. 2013)).
[42] *Miles*, 360 F.3d at 279.
[43] *Ganji*, 880 F.3d at 777 (quoting *United States v. Imo*, 739 F.3d 226, 235–36 (5th Cir. 2014)).
[44] *Willett*, 751 F.3d at 339.
[45] *Id.*
[46] 18 U.S.C. § 1516(a) (2012).

performance of official duties; (2) that the auditor's duties related to a person, entity, or program receiving in excess of $100,000, directly or indirectly, from the United States in any one year period under a contract or subcontract, grant, or cooperative agreement, and (3) the defendant did so with intent to deceive or defraud the United States.[47]

## E. Individual Defendants' Arguments

Each Defendant argues he or she is entitled to a judgment of acquittal on all applicable counts under Federal Rule of Criminal Procedure 29(c) on the grounds that the verdicts were not supported by sufficient evidence. The Court will consider each Defendant's arguments in turn.[48]

### 1. Shelton Barnes

The jury convicted Defendant Shelton Barnes of all counts for which he was charged in the Second Superseding Indictment: Counts 1 and 2 for conspiracy, Counts 3–7 (health care fraud related to patient HaHa), Counts 8–10 (health care fraud related to patient KiSt), Counts 11–17 (health care fraud related to Patient ArGi), and Count 47 (obstruction of a federal audit).[49]

As to Counts 1 and 2, Barnes essentially argues no reasonable juror could have found that he knowingly agreed to join a conspiracy because no conspiracy existed. According to Barnes, Lisa Crinel testified that the doctors associated with Abide had "nothing to do with the Abide Case-Mix Diagnosis, and had no knowledge of it. She stated that this higher billing, which misled Medicare, was the extent of [her] and her company's

---

[47] The Court discussed the elements necessary to prove obstruction of a federal audit in an earlier denial of Defendant Shelton Barnes' Rule 29 motion for judgment of acquittal. *See United States v. Crinel*, No. 15-61, 2017 WL 2226148 (E.D. La. May 19, 2017).

[48] The recitation of the evidence presented with respect to each Defendant and each count is not intended to be exhaustive.

[49] R. Doc. 1067.

fraud."[50] Barnes further asserts the jury could not reasonably have concluded that he was a part of the conspiracy, because Lisa Crinel testified that she "never thought [she] had a conspiracy going on."[51]

In a supplemental memorandum, Barnes relies on *Ganji* to shore up his argument that the Government failed to present sufficient proof that he knowingly and voluntarily entered into an agreement with Crinel.[52] Barnes argues none of the other doctors in the alleged conspiracy testified he was in a conspiracy with them. Further, Barnes contends Maberry and Williams "had no nefarious discussions" with him, and he asserts that any fraudulent billing was done entirely by them, on their own behalf.[53]

Specifically with regard to Count 2, Barnes argues "the gravamen of the government's kickback theory for medical director fees was that the medical director contracts between Abide and Barnes were shams."[54] Barnes contends, however, that these contracts were in fact lawful and did not represent a kickback.[55] Barnes points to Lisa Crinel's testimony that Barnes was on call 24-hours-a-day, was available for consultation with nurses at Abide, met with case managers at Abide, and was involved in seminars, board meetings, and health fairs.[56]

Regarding Counts 3 through 17, Barnes insists the evidence at trial was insufficient to show he knowingly engaged in health care fraud, and argues that the patients he certified were, in fact, homebound.[57] He attacks the testimony of the government's expert

---

[50] R. Doc. 1074-1 at 3.
[51] *Id.* at 5.
[52] R. Doc. 1421 at 5.
[53] *Id.* at 6.
[54] R. Doc. 1074-1 at 9.
[55] *Id.*
[56] *Id.* at 10.
[57] *Id.* at 5–6.

witness, Dr. Brobson Lutz, on the grounds that Dr. Lutz "did not, and never even attempted to, have a face-to-face meeting . . . with any of the eight patients."[58] Barnes asserts the testimony of therapists Lee Mixon and Brenda Saizan, who visited patient ArGi prior to his homebound certification, suggested that ArGi was, in fact, homebound. Barnes argues this testimony should be "clear reasonable doubt that any rational juror should have recognized."[59]

Barnes further contends that, even if fraudulent activities occurred within his office, the testimony of Eleshia Williams and Rhonda Maberry demonstrated that they alone conducted the fraud, without Barnes' knowledge or consent.[60] He argues Williams testified that Barnes had no knowledge of the referral fees collected by his biller or fraudulent billing. He also claims that Maberry testified that "behind his back and without his knowledge, she lied, cheated and stole from Medicare with false billing, which rendered no benefit to Barnes."[61]

<u>Count 1 – Conspiracy to Commit Health Care Fraud</u>

Because the conspiracy to pay health care kickbacks was associated with the larger conspiracy to defraud Medicare, much of the evidence for counts 1 and 2 is overlapping.[62] Barnes' main argument in favor of his motion for acquittal as to these counts is that no reasonable juror could have convicted him of conspiracy when Lisa Crinel testified that there was no conspiracy.[63] Barnes neglects to mention that Lisa Crinel accepted responsibility for committing health care fraud on behalf of herself and Abide[64] and

---

[58] *Id.* at 6.
[59] *Id.* at 9.
[60] *Id.* at 11–14.
[61] *Id.* at 14.
[62] *United States v. Murthil*, 679 Fed.Appx. 343 (5th Cir. 2017).
[63] *Id.* at 5.
[64] R. Doc. 1110 at 73.

pleaded guilty to the conspiracy to commit health care fraud and the conspiracy to pay and receive illegal kickbacks from 2008 to 2014.[65] Trial Exhibit 1607 is the plea agreement signed by Lisa Crinel with respect to these charges. Trial Exhibit 1502 is a list of the property she forfeited as a result of her guilty plea.

Lisa Crinel specifically admitted that she conspired with Shelton Barnes, Henry Evans, Michael Jones, and Gregory Molden to commit health care fraud.[66] The doctors agreed to sign 485s for patients who were neither under their care nor eligible for home health care and to refer these patients to Abide. Crinel testified she paid kickbacks to the doctors and they signed false invoices to cover up the kickbacks.[67] Among other acts in support of the conspiracy, Crinel admitted to "ghosting" patients—discharging patients on her records but continuing to provide home health care services to them—to avoid a Medicare audit, and she testified the doctors signed discharge orders and recertification orders for these patients with no questions asked.[68] In a massive understatement, she admitted that she did not have a "clean house."[69]

Testimony of other witnesses corroborates Lisa Crinel's testimony and provides other evidence that Barnes agreed to join the health care conspiracy. Rhonda Maberry is a nurse practitioner who worked with Barnes for many years. With regard to Count 1, the testimony of Maberry established that Barnes was knowingly involved in a conspiracy to defraud Medicare with Lisa Crinel and Abide. Maberry testified in great detail about her relationships with Barnes, Crinel, and the other participants in the scheme.[70] Although

---

[65] R. Doc. 1108 at 36–37, R. Doc. 1110 at 69.
[66] R. Doc. 1110 at 70.
[67] *Id.* at 101–02.
[68] R. Doc. 1110 at 76–77.
[69] *Id.* at 79.
[70] R. Doc. 1424.

Barnes contends he had no knowledge of the scheme, Maberry's testimony plainly demonstrates Barnes' knowledge of and participation in the conspiracy to defraud Medicare by signing 485 certifications for patients who were not eligible for home health care and who were not under his care.

Maberry testified that she told Barnes she was signing 485s without seeing the patients, and without knowing whether the patient qualified for home health.[71] Maberry testified that, while she would sometimes sign 485s while Barnes was out, "there were also times when there were so many [485s], sometimes we sat there together and I would take a pack and he would take a pack. So it's not like he never knew."[72] Maberry also testified that Barnes was aware that she was signing *his* name to 485s because, as a nurse practitioner, he knew she was not allowed to sign *her* own name to them.[73]

Leanne Dodson testified that Medicare requires that the patient certified for home health care be under the care of the certifying physician.[74] Maberry testified that, for some patients certified for home health care, Barnes had no patient charts so the patient could

---

[71] *Id.* at 185.

[72] *Id.* at 204. As a general note, much of the evidence of health care fraud in this case involves Form 485 certifications. A Form 485 is a form used by a home health agency to present a home health certification and a plan of care for a homebound patient. The forms are referred to herein as "485 certificates" or "485s." The form is then sent to the physician, who attests to the following certification:

> I certify/recertify that this patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy and/or speech therapy or continues to need occupational therapy. The patient is under my care, and I have authorized the service on this plan of care and will periodically review the plan.

*See, e.g.*, Gov. Exhs. 116, 117, 118 (Evans); 119, 123 (M. Jones); 136 (Molden). Accordingly, for any 485 Forms signed by a physician, the physician has certified that (1) the patient is homebound, (2) the patient is under that physician's care, and (3) the physician would periodically review the plan.

As a condition of a physician's participation with Medicare, a physician signs forms agreeing they would submit claims that are accurate, complete, and truthful. These enrollment forms acknowledge penalties for false information, and the 485 Forms also state that "anyone who misrepresents, falsifies, or conceals essential information required for payment of Federal funds may be subject to fine, imprisonment, or civil penalty under applicable Federal laws." *See, e.g.*, Gov. Exhs. 116, 117, 118 (Evans); 119, 123 (M. Jones); 136 (Molden).

[73] *Id.* at 70–71, 74–75.

[74] R. Doc. 1478 at 9.

not have been under Barnes' or her care as required by Medicare.[75] Maberry testified the certifications and re-certifications for home health care signed by her and Barnes were not based on the current condition of the patient because there were no patient files on which to base such an assessment.[76] Maberry testified that, on some occasions, Barnes signed 485s for patients he had not seen for five years and, as a result, there could not have been any information on which to base a certification that the patient was qualified for home health care.[77] When Maberry became concerned and told Barnes that the records for these patients contained insufficient notes, which would suggest to auditors that the patients were not in fact under their care, Barnes did not stop signing the certifications and instead asked only, "How long would it take for you to fix it?"[78]

Maberry testified that Trial Exhibit 315 was a file kept at Barnes' office filled with "missed visit" forms, often for patients who had been certified for home health care. She testified that repeated missed visits indicate that a patient is not eligible for home health care.[79] These missed visit forms should have alerted Barnes to the fact that many patients certified for home health care, in fact, were not eligible.

Maberry further testified that she expressed her moral concerns about the ongoing fraud to Barnes. Maberry explained, "There was on one occasion that I did say, you know, I think I'm just going to go to the building—meaning the FBI building—and tell them everything that has been going on that I've done. I did say that to [Barnes]."[80] Maberry testified that Barnes later told her, "From this point on, let me sign the 485s. Just in case

---

[75] R. Doc. 1424 at 234.
[76] *Id.* at 85.
[77] *Id.* at 32–33.
[78] *Id.* at 24.
[79] *Id.* at 144–49.
[80] *Id.* at 184.

something happens, I need to sign them."[81] The next year, she quit working for Barnes because she was uncomfortable with the Abide fraud:

> I felt that there were some things going on; people being in home health for over five years. It was really getting to me. And there were times when—you know, I'm sort of looking over my shoulder waiting on the authorities to come . . . . So I would just try to count that time down and say, Okay, I made it another year . . . . I had told Barnes to tell Lisa Crinel I was quitting. I told him my excuse to her would be that I had to study for the board . . . in December, I did quit.[82]

Maberry testified that, at that point, Barnes did in fact start signing all the 485s.[83] For example, Trial Exhibit 412 contains a 485 signed by Barnes (after Maberry quit signing 485s) for KaBa certifying her for home health care based on her hypertension when she did not in fact suffer from high blood pressure according to Maberry; Trial Exhibit 603 includes a 485 for patient HaHa signed by Barnes (after Maberry quit signing 485s) certifying her for home health care based on her high blood pressure when, according to Maberry, her blood pressure was not elevated; Trial Exhibit 991 contains 485s for patient KiSt signed by Barnes (after Maberry quit signing 485s); and Trial Exhibit 583 contains 485s signed by Barnes for patient ArGi (after Maberry quit signing 485s).

Shelton Barnes, as well as the other Defendants, filed supplemental memoranda in support of their post-trial Rule 29 motions relying on the Fifth Circuit's recent decision in *United States v. Ganji* arguing the Government did not prove that the Defendants made an agreement to commit health care fraud.[84] Although the Defendants focused on *Ganji*, several recent Fifth Circuit opinions reviewing the evidence necessary to prove the elements of conspiracy to commit health care fraud are more similar to the case now

---

[81] *Id.* at 71.
[82] *Id.* at 68–69
[83] *Id.* at 76–77.
[84] R. Docs. 1421, 1435 (Barnes), 1437 (Molden), 1438 (Michael Jones), 1439 (Paula Jones), 1440 (Evans), 1441 (Nora).

before the Court. In *United States v. Dailey*, for example, the defendant, a doctor charged with referring patients to a home health agency in exchange for kickbacks, argued there was insufficient evidence of an agreement to conspire to commit health care fraud.[85] At trial, the owner of the home health agency testified she had agreed with the doctor to sign false certifications in exchange for health care kickbacks.[86] The owner's testimony was corroborated by monthly checks from the agency to the doctor. The Fifth Circuit found this evidence sufficient to prove beyond a reasonable doubt that the doctor had agreed with the owner to engage in a health care fraud conspiracy. [87]

In contrast, in *United States v. Ganji*, the Government did not present direct evidence of an agreement to join the conspiracy.[88] Rather, the Government relied on a concert-of-action theory to prove an agreement existed.[89] As the Fifth Circuit noted, "Agreements need not be spoken or formal, and the Government can use evidence of the conspirators' concerted actions to prove an agreement existed."[90] "The actions and the surrounding circumstances must be incriminating enough to warrant a finding that the Government provided the existence of an agreement beyond a reasonable doubt."[91] At the *Ganji* trial, the Government presented evidence that (1) Dr. Murray, who held a similar position to Dr. Ganji, defrauded Medicare; (2) Dr. Ganji received a monthly check from the agency after she accepted the position; and (3) her referrals to the agency increased

---

[85] *United States v. Dailey*, 868 F.3d 322, 329 (5th Cir. 2017).
[86] *Id.* at 326.
[87] *Id.* at 329.
[88] 880 F.3d 760 (5th Cir. 2018).
[89] *Id.* at 767–68.
[90] *Id.* at 767.
[91] *Id.* at 768.

after she accepted the job.[92] There was no direct evidence, however, that Dr. Ganji engaged in the same fraudulent conduct as Dr. Murray.[93]

Each Defendant claims that *Ganji* supports his or her request for judgment of acquittal.[94] However, important factual distinctions exist between *Ganji* and this case. Crucially, the Fifth Circuit went to great lengths to emphasize that *Ganji* was the rare case in which no direct testimonial evidence was presented to prove that the defendant had agreed to join a conspiracy. As the court noted, the "Government presented eighteen witnesses, none of whom could provide direct evidence of [Dr. Ganji's] actions because the witnesses never acted with the [defendant] to commit the specific conduct."[95] The Government instead presented a concert-of-action theory to prove Dr. Ganji's agreement in the conspiracy.[96] In this case, the Government presented direct and compelling evidence of Shelton Barnes' and the other Defendants' agreement to join the conspiracy to commit health care fraud.

The second element of conspiracy to commit health care fraud requires the prosecution to prove the defendant knew the unlawful purpose of the agreement. For example, in *United States v. Dailey*,[97] evidence was presented at trial showing the defendant doctor did not have patient records for the individuals he certified for home health, "which would be unusual if he were actually providing medical consulting services."[98] Further, the owner of the home health agency testified that Dailey "never once

---

[92] *Id.* at 771.
[93] *Id.*
[94] *See, e.g.*, R. Doc. 1453 ("[T]he facts described [in *Ganji*] are practically identical, or substantially so, to the facts brought out at trial regarding Barnes.").
[95] *Ganji*, 880 F.3d at 766.
[96] *Id.* at 769–80.
[97] 868 F.3d at 329.
[98] *Id.*

contacted her to consult about one of the patients."[99] The Fifth Circuit found this evidence sufficient to infer that Dailey knew the fraudulent nature of his agreement.[100] In another recent case, the Fifth Circuit reviewed the convictions of two defendants—Jo Ann Murthil, an office manager, and Roy Berkowitz, a doctor—charged in connection with a home health care fraud scheme.[101] Murthil argued that the Government did not prove the element of knowledge with regard to her convictions for conspiracy to commit health care fraud, the kickback conspiracy, or substantive health care fraud. [102]

The Fifth Circuit explained the Government presented testimony that Murthil had twenty years of experience in the home health care field. Further testimony demonstrated that Murthil was aware that certain patients were not homebound, and that it was Murthil's responsibility to keep track of these non-homebound patients and assign them to nurses involved in the conspiracy.[103] Based on this evidence, the court concluded that a rational juror could find Murthil was knowingly complicit in the scheme to defraud Medicare. With respect to defendant Berkowitz, the court emphasized that Berkowitz certified patients for home health, despite the fact that he only "spent about ten to fifteen minutes 'at most' with each new patient, that he never asked about the patient's ability to leave home, and that he never performed a physical exam to see if the new patient was mobile."[104] Berkowitz also admitted at trial that he knew some of the patients he certified were not in fact homebound, and that he signed forms that were already filled out by Morad's staff.[105] The court found this evidence sufficient for a rational factfinder to

---

[99] *Id.*
[100] *Id.*
[101] *United States v. Murthil*, 679 F. App'x 343 (5th Cir. 2017).
[102] *Id.*
[103] *Id.* at 349.
[104] *Id.* at 349–50.
[105] *Id.* at 350.

conclude that Berkowitz knowingly joined in an agreement to commit health care fraud.[106]

Circumstantial evidence that a defendant was authorizing home health services for patients who were not under his or her care—not maintaining records when it would be unusual not to have them, or not conducting adequate medical examinations—may be sufficient to prove that the defendant knew of the unlawful nature of the acts.[107]

Finally, the Court allowed the Government to present statistical evidence with respect to the 485s signed by Barnes, as well as the other individual Defendants.[108] Leanne Dodson testified that an individual patient's eligibility would not be based on a statistical analysis but that statistical evidence might provide a red flag indicating Medicare fraud.[109] Dr. Tumulesh Solanky is the chair of the mathematics department at the University of New Orleans. He was qualified, without objection, to testify for the Government as an expert in the field of statistics and probability.[110] Dr. Solanky was retained by the Government to assist in analyzing Medicare data for the period from January 1, 2009 until October 27, 2014.[111] He compared Abide's Part A billing data with nationwide billing data and with Louisiana-based home health agency billing data.[112]

He focused on the seven billing codes associated with case-mixed diagnoses,[113] which the Government's witnesses testified Abide used to increase its Medicare's reimbursement. Dr. Solanky testified there is a statistically significant difference between

---

[106] *Id.*
[107] *Id.* at 349–50.
[108] R. Doc. 832.
[109] R. Doc. 1477.
[110] R. Doc. 1476 at 11.
[111] *Id.* at 12.
[112] *Id.*
[113] *Id.* at 14.

the national and Louisiana percentages of patients with these seven case-mix diagnoses and the percentage of patients of Barnes, Evans, Molden, and Jones with these diagnoses.[114] In other words, the disparity between the national and Louisiana-based percentages and the percentages of Barnes, Evans, Michael Jones, and Molden is too large to have happened by chance. For example, in Louisiana, ninety-eight percent of providers had nine or fewer beneficiaries with the stomach function disorder diagnosis code,[115] which is less than one percent of their patients.[116] In contrast, fifty-six percent of Abide patients had this code diagnosis.[117] Approximately seventy percent of Barnes' patients had this diagnosis; sixty-three percent of Evans' patients had this diagnosis; thirty-four percent of Jones' patients had this diagnosis; and eighty percent of Molden's patients had this diagnosis.[118]

Dr. Solanky also compared the number of episodes of home health care certified for Abide patients compared to the national average.[119] Dr. Solanky testified that the national average was 1.8 episodes per beneficiary in 2006 and 1.9 episodes per beneficiary in 2013.[120] With respect to Abide patients, thirty-two percent had more than ten episodes and forty-four percent had more than six episodes.[121] Dr. Solanky testified the probability of these disparities being due to chance is smaller than the probability of being struck by lightning in a given year[122] or winning the Powerball lottery.[123]

---

[114] *Id.* at 40.
[115] *Id.* at 43.
[116] Trial Exhibit 1487.
[117] *Id.*
[118] *Id.*
[119] *Id.* at 16.
[120] *Id.* at 52.
[121] *Id.* at 51.
[122] *Id.* at 86.
[123] *Id.* at 87.

In this case, the Government has presented evidence that Shelton Barnes, Michael Jones, Gregory Molden, Paula Jones, and Jonathan Nora agreed to join the conspiracy to commit health care fraud with knowledge of its unlawful purpose. As explained below, with respect to Shelton Barnes, Henry Evans, and Gregory Molden, Lisa Crinel testified unequivocally that she agreed with each of them for Abide to make monthly payments in exchange for patient referrals. With respect to Michael Jones and Paula Jones, Lisa Crinel testified unequivocally that she agreed with them for Abide to pay Paula Jones an increased salary, and for Abide to pay Larry Taylor's salary, in exchange for Michael Jones' patient referrals. With respect to Paula Jones and Jonathan Nora, Lisa Crinel and other witnesses testified as to their knowledge of and participation in the conspiracy. With respect to all the Defendants, the case at bar more closely mirrors *Dailey*, in which direct testimony that a defendant agreed to join a conspiracy, with corroborating evidence, suffices to prove the elements of agreement and knowledge.[124]

## Count 2 – Conspiracy to Receive and Pay Illegal Health Care Kickbacks

In addition to the evidence described above, Crinel's testimony, along with that of Maberry, Wilneisha Jakes, and Wendy Ervin, establishes that Barnes was receiving $3,500 a month from Abide in exchange for referring patients to Abide. As mentioned above, Lisa Crinel specifically pleaded guilty to conspiring with Shelton Barnes, Henry Evans, Michael Jones, and Gregory Molden,[125] and testified she paid kickbacks to them, and they signed false invoices to cover up the kickbacks.[126] Trial Exhhibits 302 through 307 are medical director agreements between Abide and Shelton Barnes. Trial Exhibit 317 includes copies of Abide's monthly checks issued to Barnes in the amount of $3,500.

---

[124] *Dailey*, 868 F.3d at 329.
[125] R. Doc. 1110 at 70.
[126] *Id.* at 101–02.

Although Barnes insists that his $3,500 per month payment from Abide was legitimate compensation for his role as a medical director, Lisa Crinel testified that she never cared about any of the responsibilities listed in Barnes' medical directorship contract, that she did not expect him to perform them,[127] and that she never paid him based on the hours in his invoices.[128] The only thing she needed from Barnes was patient referrals.[129] She testified that, if he stopped referring patients, "Then we would end our financial arrangement."[130]

Rhonda Maberry corroborated Crinel's testimony that Barnes received $3,500 per month from Abide and Crinel for his medical directorship and to "have the 485s done."[131] Maberry also confirmed she signed invoices supporting Abide's payments to Barnes,[132] but that Barnes did not, to her knowledge, perform in-service programs or educational programs or go to monthly meetings at Abide.[133] Wilneisha Jakes testified that she agreed with Barnes to pay him money for patient referrals."[134] Wendy Ervin, an executive assistant and office manager at Abide from 2008 until 2012,[135] testified that Shelton Barnes performed no duties as medical director at Abide[136] and she completed the invoices signed by Shelton Barnes by inserting random numbers for the hours billed.[137]

---

[127] R. Doc. 1108 at 104.
[128] *Id.* at 114.
[129] *Id.* at 104−05.
[130] *Id.* at 105.
[131] *Id.* at 58, 133.
[132] *Id.* at. 128−29.
[133] *Id.* at 125−27.
[134] R. Doc. 1015 at 78.
[135] R. Doc. 1472 at 5.
[136] *Id.* at 16−18.
[137] *Id.* at 19.

The evidence discussed above is sufficient to sustain Shelton Barnes' convictions on Counts 1 and 2 of the Second Superseding Indictment, and his motion for judgment of acquittal on these counts is denied.

Counts 3 Through 17 - Health Care Fraud

Trial evidence also established Barnes' guilt as to Counts 3 through 17, the substantive counts of health care fraud. Abundant evidence was presented at trial showing Shelton Barnes knowingly defrauded Medicare. Maberry testified that Barnes signed 485s certifying patients for home health care and certifying that the patients were under his care.[138] Maberry testified she signed 485s with Barnes' signature for patients neither one of them had ever seen, and for whom they had no records.[139] Her testimony established that Barnes had patients in home health for as long as sixty-four months, when it was impossible for him to know the patients' home health status.[140] Maberry testified that the Abide patients for whom they had no patient charts were not under either her or Barnes' care, and that further, without such documentation, patients *could not* have been under their care.[141] The Government presented evidence showing Barnes had no patient charts for seventeen of the patients whose records were introduced into evidence, and he had no patient charts at all for 163 Abide patients for whom he billed Part B plan of care oversight.[142]

Counts 3–7 relate to five episodes of home health billed for patient HaHa. The medical records and Medicare billing records of HaHa were admitted by stipulation and

---

[138] R. Doc. 1424 at 133.
[139] *Id.* at 31–32.
[140] *Id.* at 32.
[141] *Id.*
[142] Gov. Exh. 1409.

through Dr. Lutz and Maberry.[143] As to Counts 3 and 4, Maberry testified that Barnes signed 485s for HaHa authorizing home health,[144] but that there was no supporting documentation for these billings.[145] The Government's expert witness, Dr. Lutz, testified that HaHa had been his patient for many years, and that, though she does not drive herself, she often left her home to run errands or go to the beauty salon.[146] Dr. Lutz testified that HaHa had no medical necessity for home health care."[147] Dr. Lutz further testified that HaHa did not know who Barnes was,[148] and that Barnes had no patient chart for HaHa.[149]

Counts 8–10 relate to three episodes of home health billed for patient KiSt. The medical records and Medicare billing records of KiSt were admitted by stipulation and introduced through Dr. Lutz and Maberry.[150] As to Counts 8 and 9, Maberry testified specifically that Barnes signed 485s for KiSt.[151] Maberry also testified that the information in KiSt's patient chart had been falsified.[152] Dr. Lutz testified there was nothing in the July 21, 2011 face-to-face encounter report between Maberry and KiSt that justified home health care.[153] Nevertheless, Barnes admitted KiSt for home health on July 23, 2011.[154]

Counts 11–17 relate to seven episodes of home health billed for patient ArGi. The medical records and Medicare billing records of ArGi were admitted by stipulation and

---

[143] Gov. Exhs. 600–07.
[144] R. Doc. 1424 at 102–19, 227–33.
[145] *Id.* at 102–03, 228.
[146] R. Doc. 1096 at 169–72.
[147] *Id.* at 193.
[148] R. Doc. 1095 at 45.
[149] R. Doc. 1096 at 172.
[150] Gov. Exhs. 990–95.
[151] R. Doc. 1424 at 105–08.
[152] *Id.* at 108.
[153] R. Doc. 1096 at 86.
[154] Gov. Exh. 991.

introduced through Dr. Lutz and Maberry.[155] Maberry specifically testified that she signed the 485s for ArGi related to Counts 14 and 17.[156] Dr. Lutz testified that ArGi was in fact not homebound, and that there was no documentation supporting the diagnoses for pernicious anemia and myasthenia as Barnes had certified.[157] Lee Mixon, a home health therapist, testified that she examined patient ArGi in his home and filled out an initial evaluation form, admitted as Trial Exhibit 583.[158] She testified that she found him not to be a candidate for physical therapy.[159] She disagreed with Shelton Barnes' conclusion that he "Needs assistance for all activities," and did not agree that he was homebound.[160] Brenda Saizan, an occupational therapist, also assessed patient ArGi in his home.[161] She concluded he was not a candidate for occupational therapy and that he was living independently with functional mobility in an adapted apartment.[162]

Shelton Barnes' motion for judgment of acquittal as to Counts 3 through 17 is denied.

Count 47

As to Count 47, the evidence introduced at trial also established that Barnes knowingly defrauded Medicare Part B by his billing and conspired with Rhonda Maberry and Eleshia Williams to obstruct an audit of his Part B billing. Eleshia Williams testified that she assisted Barnes with his G-code billing based on the 485s.[163] Maberry testified she learned that Barnes was no longer being paid for his G-code billing because Medicare

---

[155] Gov. Exhs. 580–88.
[156] R. Doc. 1424 at 102–19, 227–33.
[157] R. Doc. 1095 at 74.
[158] R. Doc. 1474 at 6.
[159] *Id.* at 21.
[160] *Id.*
[161] R. Doc. 1475 at 7.
[162] *Id.* at 15.
[163] R. Doc. 1456 at 10.

had requested additional documentation.[164] She testified that she relayed this information to Barnes, and he instructed her to make sure that Elishia was keeping up with the documentation.[165] She then learned that Barnes was being audited by Medicare when Barnes gave her a large grocery bag containing over 50 audit letters.[166] Eleshia Williams confirmed that Barnes produced a grocery bag full of letters from Medicare.[167] Williams testified that the letters were claim rejections by Medicare because additional information was needed.[168] Maberry testified Shelton Barnes told her that for them to get paid, they had to complete the audit for Medicare.[169] Williams testified that she and Maberry put the additional documentation together.[170] Maberry testified Barnes would sign notes on patient charts after the patient had been seen by Maberry to create the appearance that Barnes had reviewed the charts.[171] This testimony belies Barnes' contention that he was unaware of the obstruction of the audit by Maberry and Williams. Also, as the Government notes, after the falsification of the audit, Barnes was paid approximately $154,993 by Medicare. Maberry explained Barnes knew the documentation being prepared by Maberry and Williams was related to the audit because he began receiving checks for the care plan oversight billing after the information was provided to Medicare.[172] Williams confirms that Barnes started getting paid when the documentation was submitted.[173]

---

[164] R. Doc. 1424 at 136.
[165] *Id.* at 137.
[166] *Id.* at 137–38.
[167] R. Doc. 1456 at 25.
[168] *Id.*
[169] R. Doc. 1424 at 139.
[170] R. Doc. 1456 at 26.
[171] *Id.* at 26.
[172] R. Doc. 1424 at 194.
[173] R. Doc. 1456 at 35.

Defendant Shelton Barnes' Motion for Judgment of Acquittal[174] is denied as to Count 47.

Conclusion

Contrary to Barnes' arguments, the Government presented abundant evidence at trial establishing his guilt, and the jury reasonably concluded he was guilty, on all counts charged against him. The testimony against Barnes, viewed in the light most favorable to the Government, is sufficient for the jury to have found the essential elements of all offenses to be satisfied beyond a reasonable doubt.

### 2. Henry Evans

The jury convicted Defendant Henry Evans on five counts of health care fraud; Count 31 related to patient JoWi, and Counts 43 through 46 related to distinct episodes for patient MaGr.[175] He was found not guilty on Counts 1 and 2.[176] In his Motion for Judgment of Acquittal, Henry Evans argues that, because the jury found him not guilty on the charges of conspiracy to commit health care fraud and conspiracy to receive illegal kickbacks, the jury's finding on the five counts of health care fraud was contrary to the evidence and not supported by evidence of criminal intent.[177]

Evans challenges the Government's evidence that he had the requisite intent to defraud Medicare.[178] Evans in particular seeks to discredit the testimony of the Government's witnesses Dr. Brobson Lutz and Agent Bradford, arguing that these witnesses did not provide testimony that the certification of patient JoWi or MaGR was

---

[174] R. Doc. 1074.
[175] *See* R. Doc. 1067.
[176] *Id.*
[177] R. Doc. 1102-1.
[178] *Id.* at 4 ("[T]here is no evidence in the record which is sufficient to establish that he knowingly and willfully certified any patient for home health care with criminal intent to defraud.").

made with fraudulent intent.[179] According to Evans, Agent Bradford only testified that she could not find JoWi's patient records in Evans' files, and Dr. Lutz' testimony that MaGr's condition did not warrant home health was not based on a patient interview, but only patient files provided by the Government.[180]

Evans also contends the Government's evidence did not prove he had actual knowledge that MaGr or JoWi were not homebound.[181] He insists his testimony at trial demonstrated MaGr was properly certified for home health because she had suffered a stroke and was partially paralyzed.[182] He also avers he mistakenly certified JoWi for home health care because he believed she was a different patient with the same name.[183] Evans emphasizes that these "mistakes, negligence, or other lax practices do not amount" to fraud.[184]

<u>Counts 31 and 43 through 46 - Health Care Fraud</u>

As discussed previously, Lisa Crinel specifically pleaded guilty to conspiring with Shelton Barnes, Henry Evans, Michael Jones, and Gregory Molden,[185] and testified she paid kickbacks to them and they signed false invoices to cover up the kickbacks.[186] The doctors agreed to sign 485s for patients who were not under their care and who were not eligible for home health care and to refer these patients to Abide. Lisa Crinel testified that she entered into a medical director agreement with Evans[187] and agreed to pay him $2,000 a month.[188] Trial Exhibit 321 is a Medical Consultant Agreement between Abide

---

[179] The Defendants' objections with regard to Dr. Lutz are discussed in Part II, *infra.*
[180] R. Doc. 1102-1 at 5.
[181] *Id.* at 7.
[182] *Id.* at 8; *see* R. Doc. 1100 at 134.
[183] R. Doc. 1440 at 9.
[184] *Id.* at 11 (citing *Ganji*, 880 F.3d at 26).
[185] R. Doc. 1110 at 70.
[186] *Id.* at 101–02.
[187] R. Doc. 1108 at 147.
[188] *Id.* at 149.

and Evans. Trial Exhibit 327 includes copies of Abide's monthly checks to Evans in the amount of $2,000. Crinel testified that Evans did not perform any of the services listed in the medical director agreement.[189] Instead, she testified that she was paying Evans for patient referrals.[190] She testified that she did not discuss the agreement directly with Evans but that the agreement was brought to her by Oliver Thomas on Evans' behalf.[191] Evans testified Thomas, a marketer for Abide, contacted Evans about working for Abide and Evans ultimately signed an agreement to be a consultant for the company.[192] Evans testified that he was paid $2,000 a month under the terms of the agreement.[193] Evans admitted that he submitted invoices to Abide for $2,000 a month,[194] but insisted that he was being paid to be "available" to provide consulting services to Abide.[195]

Lisa Crinel admitted to "ghosting" patients to avoid a Medicare audit and testified the doctors, including Evans, signed discharge orders and recertification orders for these patients with no questions asked.[196] Wendy Ervin testified that, at Crinel's direction, she prepared the agreement between Abide and Evans for him to be a medical director, introduced into evidence as Trial Exhibit 321, by copying the Shelton Barnes contract.[197] Ervin also testified Evans performed none of the services called for in the agreement,[198] and she prepared his invoices by inserting random numbers.[199] Wendy Ervin, Gaynell Leal, Linda-Frazier Johnson, and Beverly Mandolph all testified they never saw Evans at

---

[189] *Id.* at 182.
[190] *Id.* at 155.
[191] *Id.*
[192] R. Doc. 1100 at 6–8.
[193] *Id.* at 10.
[194] *Id.* at 71.
[195] R. Doc. 1100 at 81–82.
[196] R. Doc. 1110 at 76–77.
[197] R. Doc. 1472 at 20.
[198] *Id.* at 21.
[199] *Id.* at 22.

the Abide office performing the services listed in the medical director contract. Vonda Gaitor and Monique Barconey, Evans' employees, testified they worked for Evans for years and he never mentioned to them that he was a medical director for Abide and was being paid $2,000 a month by Abide.

The Government presented direct evidence of Evans' health care fraud in connection with patients MaGr and JoWi. Evidence at trial showed (1) neither of these patients was homebound at the time Evans certified them for home health care, and (2) Evans acted with the intent to defraud. Regarding MaGr, Dr. Lutz reviewed patient records starting before 2009 and lasting through 2014, and testified that patient MaGr could not have had the conditions to support the home health diagnoses provided by Evans.[200] For example, Evans initially diagnosed her with cerebral lipidosis, which Dr. Lutz testified MaGr could not possibly have had.[201] Evans also certified MaGr to home health for arthropathy, but Dr. Lutz testified MaGr did not take any medications to treat arthritis and only reported minor hand pain and sinus headaches at her first home health visit.[202] Dr. Lutz also testified that medical records showed MaGr had a rash under her breasts, but that this rash did not render her homebound.[203] Special Agent Bradford testified that a rash under the breasts is a specific example listed in the Medicare manual of a diagnosis that does not require home health services.[204] Nevertheless, Evans certified MaGr for home health based on the rash.[205]

---

[200] R. Doc. 1095 at 130.
[201] *Id.*
[202] *Id.* at 130–31.
[203] R. Doc. 1095 at 144–45.
[204] R. Doc. 1433 at 15.
[205] Gov. Exh. 592; *see* R. Doc. 1095 at 143–44, 170–71.

Evans signed for two episodes of home health care for patient JoWi in 2013.[206] As Evans admitted on the stand, however, he never saw this patient.[207] Special Agent Bradford explained the patient file she found in Evans' office was not for the patient JoWi he certified for home health in 2013, but for another patient altogether.[208] Evans asserts the fraudulent billings were an honest mistake—that he was thinking of his earlier patient with the same name when he signed the 485s.[209] Still, Evans admitted he not seen his earlier patient named JoWi since 2009, nearly five years before he signed the certification for home health in 2013.[210] As a result, even accepting Evans' explanation, he certified twice that JoWi was "under his care" and needed home health, even though he had not treated the patient he *thought* he was certifying for over five years.[211]

Evans' own testimony proves he knowingly signed false documents.[212] On cross-examination, the Government confronted Evans with specific 485s he signed that included false diagnoses, and Evans admitted that he billed Medicare Part B for the same false diagnoses listed on the form:

> Q: What would you do when you would see a fake diagnosis or a diagnosis that didn't apply to your patient?
>
> A: I would look at them if there was some question about it. And in my mind, again, I was more concerned about the kinds of things that we talked about my patient. I did know, however, that as we went along, these fake diagnoses disappeared because these people knew who my patients were and they knew what the diagnoses were and they cleaned it up. *But initially, there were, again, quote, end quote, in my mind fake diagnoses.*[213]

---

[206] Gov. Exh. 1101; R. Doc. 1100 at 116–17.
[207] R. Doc. 1100 at 116–17.
[208] R. Doc. 1433 at 3–4.
[209] R. Doc. 1440 at 9.
[210] R. Doc. 1100 at 117.
[211] *Id.*
[212] R. Doc. 1100 at 38, 89–91.
[213] *Id.* at 38.

Further, Evans was confronted with specific examples of 485s he signed for which the fake diagnoses did not "disappear," and he admitted signing these 485s.[214] Bills submitted to Medicare by Evans also established that he was paid for the fake diagnoses.[215] The Government also presented Medicare data showing that the number of episodes he certified for Abide patients quintupled after he started getting paid by Abide.[216]

The statistical evidence presented by Dr. Tumulesh Solanky also supports the jury's verdict with respect to Henry Evans. As discussed above, Dr. Solanky focused on the seven billing codes associated with case-mixed diagnoses,[217] which the Government's witnesses testified Abide used to increase its Medicare's reimbursement. He testified there is a statistically significant difference between the national and Louisiana percentages of patients with these seven selected diagnoses and the percentage of patients with these seven selected diagnoses as diagnosed by Barnes, Evans, Molden, and Jones.[218] For example, in Louisiana, ninety-eight percent of providers had nine or fewer beneficiaries with the stomach function disorder diagnosis code,[219] which is less than one percent of their patients.[220] In contrast, fifty-six percent of Abide patients had this code diagnosis[221] and sixty-three percent of Evans' patients had this diagnosis.[222]

Based on the evidence above, the Court finds it was not unreasonable for the jury to discredit Evans' self-serving testimony, draw rational inferences from Evans' actions, and find him guilty of five counts of health care fraud, as "[t]he jury retains the sole

---

[214] *Id.* at 89–92; 95–96.
[215] *Id.* at 100.
[216] *Id.* at 140.
[217] *Id.* at 14.
[218] *Id.* at 40.
[219] *Id.* at 43.
[220] Trial Exhibit 1487.
[221] *Id.*
[222] *Id.*

authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses."[223] Accordingly, Defendant Henry Evans' Motion for Judgment of Acquittal[224] on the health care fraud counts is denied.

Conclusion

Contrary to Evans' arguments, the Government presented sufficient evidence at trial establishing his guilt, and the jury reasonably concluded he was guilty on counts 31 and 43–46. The testimony against Evans, viewed in the light most favorable to the Government, is sufficient for the jury to have found the essential elements of all offenses to be satisfied beyond a reasonable doubt.

### 3. Michael Jones

The jury found Defendant Michael Jones guilty on Counts 1 and 2 for conspiracy, Count 18 (health care fraud as to patient AlGi), Counts 22 through 26 (health care fraud as to patient LiSc), and Count 27 (health care fraud as to patient EvLa).[225] In his renewed Motion for Judgment of Acquittal, Michael Jones argues there was insufficient evidence to support the conspiracy convictions as well as the convictions for health care fraud.[226] As to Counts 1 and 2, he asserts the Government failed to establish that he agreed to join the conspiracy or that he had the requisite intent to defraud Medicare. Michael Jones contends his involvement in the Abide conspiracy was argued only on a theory of "guilt by association," as he had no medical directorship agreement with Abide.[227]  He argues Lisa Crinel's testimony that "I never thought I had a conspiracy going on"[228] is sufficient

---

[223] *Gibson*, 875 F.3d at 186; *see also Umawa Oke Imo*, 739 F.3d at 236–37.
[224] R. Doc. 1102.
[225] *See* Doc. 1067.
[226] R. Doc. 1085-1.
[227] *Id.* at 4.
[228] R. Doc. 1046 at 48.

to create a reasonable doubt as to his involvement in the alleged conspiracy, such that "no rational juror could return a verdict of guilty for a conspiracy that did not exist."[229]

Michael Jones also argues no rational juror could have convicted him on the conspiracy charges while acquitting Henry Evans. Michael Jones contends that, unlike the other doctors (including Evans), he did not have a medical directorship arrangement with Abide, and the "Government offered minimal, attenuated evidence to support its allegations that any conspiracy existed between Dr. Jones and the other defendants."[230]

As to the counts of health care fraud, he asserts "the Government failed to prove that any specific patient . . . was fraudulently certified for home health by Dr. Jones."[231] Rather, argues Michael Jones, "the Government's evidence consisted primarily of documents from Abide that Dr. Jones never signed, approved, or even saw."[232] Regarding Count 18, he points to evidence offered at trial suggesting that patient ArGi was, in fact, homebound. He argues Brenda Saizan testified she noticed medical equipment in ArGi's home, which suggested ArGi may have been homebound. Saizan testified:

> Q: What was your conclusion under "rehab potential"?
> A: "The patient is not a candidate for occupational therapy. The patient is independent with ADL and functional mobility. He lives in an adapted apartment."
> Q: Did you think this patient was homebound?
> A: I guess he was homebound. He had a power chair, so I guess he could possibly leave the home.[233]

Michael Jones argues Saizan's testimony creates a reasonable doubt as to ArGi's homebound status, and it was therefore irrational for the jury to find that he fraudulently certified ArGi for home health status.

---

[229] R. Doc. 1085-1 at 6.
[230] *Id.* at 7.
[231] *Id.* at 5.
[232] *Id.*
[233] R. Doc. 1475 at 15.

As to Count 27, which relates to EvLa, Michael Jones asserts the jury's guilty verdict cannot be reconciled with its decision to acquit him on Counts 19, 20, and 21, which relate to ArGi, because similar evidence was presented with regard to each of the four counts.[234] Jones asserts that in each of the four episodes, he did not sign physician orders, 485s, or any other documentation.

<u>Counts 1 and 2 - Conspiracy</u>

Because the conspiracy to pay health care kickbacks was associated with the larger conspiracy to defraud Medicare, much of the evidence for counts 1 and 2 is overlapping. As with Barnes, Michael Jones' main argument in favor of his motion for acquittal as to these counts is that no reasonable juror could have convicted him of conspiracy when Lisa Crinel testified that there was no conspiracy.[235] As with Barnes, Michael Jones neglects to mention that Lisa Crinel accepted responsibility for committing health care fraud on behalf of herself and Abide[236] and pleaded guilty to the conspiracy to commit health care fraud and the conspiracy to pay and receive illegal kickbacks from 2008 to 2014.[237] As mentioned above, Lisa Crinel specifically pleaded guilty to conspiring with Shelton Barnes, Henry Evans, Michael Jones, and Gregory Molden,[238] and testified she paid kickbacks to them and they signed false invoices to cover up the kickbacks.[239] The doctors agreed to sign 485s for patients who were not under their care and who were not eligible for home health care and to refer those patients to Abide.

---

[234] R. Doc. 1985-1 at 8.
[235] R. Doc. 1074-1 at 5.
[236] R. Doc. 1110 at 73.
[237] R. Doc. 1108 at 36–37, R. Doc. 1110 at 69.
[238] R. Doc. 1110 at 70.
[239] *Id.* at 101–02.

The trial testimony of Lisa Crinel clearly demonstrated an agreement between Michael Jones and Lisa Crinel to perpetrate health care fraud and engage in a kickback conspiracy. Crinel was introduced to Michael and Paula Jones through a kickback arrangement with Jobie Crear prior to Hurricane Katrina in 2005.[240] In exchange for sending patients to Crinel's agency, Crinel paid the salary of Paula Jones, who worked as Crear's biller, and several other of his employees.[241] After Katrina, Michael Jones met with Crinel at the Riverside Hilton and told her he intended to reestablish his medical practice by renting space from Crear.[242] At this meeting, Crinel agreed to hire Paula Jones back as a part-time biller with the understanding that Paula would also work as Michael's biller.[243] Crinel testified that, later, Michael Jones met with Crinel at the Rum House, and informed her that he intended to set up his own office.[244] Michael Jones offered to send patients to Abide in exchange for a doubling of his wife's salary.[245] Crinel further testified that she asked whether Michael Jones wanted a medical directorship like the other doctors, and he declined.[246] According to Crinel, Jones stated he only wanted Crinel to pay Paula Jones the higher salary.[247] Crinel testified that she teased Jones by saying "he was trying to be the next Jobie Crear," [248] meaning that Michael Jones wanted to set up a referral-for-kickback arrangement in which Paula Jones' and Larry Taylor's salaries would be paid rather than his being paid a medical director fee.

---

[240] R. Doc. 1108 at 241.
[241] *Id.*
[242] *Id.* at 207.
[243] *Id.*
[244] *Id.* at 234.
[245] *Id.*
[246] *Id.*
[247] *Id.*
[248] *Id.*

Testimony and documentary evidence corroborated the substance of the kickback scheme. Payroll documents introduced at trial showed that once Michael Jones began sending patients, Paula Jones' salary doubled.[249] Crinel testified that the raise she gave Paula Jones was not performance-related, but was rather "for Michael Jones to send an abundance of patients to the agency."[250] The testimony of Mark Dyer, Lisa Crinel's accountant, confirmed that Paula Jones' salary was above market rate and was not increased based on her superior billing ability.[251] Dyer testified that Paula Jones' salary was unusually high salary for a biller, particularly a biller with only moderate skill.[252] When Crinel complained to Paula Jones about the low number of patients referred by Michael Jones, Paula Jones responded that that was a problem between Crinel and Michael Jones.[253] Crinel testified that after the pay increase, Paula Jones did not thank Crinel or otherwise inquire about her raise.[254]

The kickback relationship between Abide and Michael Jones also involved the payment of Larry Taylor's salary, even though he was not working for Abide. Taylor, who worked for Michael Jones, testified that Michael Jones asked Crinel to put Taylor on the Abide payroll.[255] Taylor's personnel file with Abide confirmed that he applied for a job as a marketer with Abide in July 2013,[256] and Abide starting paying Taylor bi-weekly checks shortly thereafter.[257] Trial Exhibit 374 includes Abide checks to Taylor during 2013. Wilneisha Jakes confirmed that Abide paid Taylor, but that he was not performing

---

[249] Gov. Exh. 365.
[250] R. Doc. 1108 at 248; R. Doc. 1110 at 74.
[251] R. Doc. 1111 at 22.
[252] *Id.*
[253] R. Doc. 1108 at 251–52.
[254] R. Doc. 1110 at 243.
[255] R. Doc. 1045 at 25–26.
[256] Gov. Exh. 387.
[257] Gov. Exh. 374.

services for Abide.[258] Crinel testified that she agreed to this arrangement because she believed Michael Jones "was going to send the patients to justify Larry's pay."[259] Taylor further testified that Crinel badgered him about the lack of referrals from Michael Jones.[260] Lisa Crinel testified that when the patients stopped coming from Michael Jones, she stopped paying Taylor.[261]

Based on this evidence, a jury could find beyond a reasonable doubt that Michael Jones engaged in a conspiracy to commit health care fraud that involved the payment of illegal kickbacks. Michael Jones' motion for judgment of acquittal as to Counts 1 and 2 are is therefore denied.

Counts 18, 22, 23, 24, 25, 26, 27 - Health Care Fraud

Michael Jones was also found guilty of seven counts of health care fraud.[262] Count 18 related to patient AlGi; Counts 22 through 26 related to patient LiSc; Count 27 related to patient EvLa.[263] Evidence and testimony at trial showed: (1) none of these three patients was homebound at the time Michael Jones certified them for home health care; and (2) Michael Jones acted with the intent to defraud.

With respect to patient ArGi, the independent analyses by therapists Lee Mixon and Brenda Saizon, conducted just three months before Jones' certification, determined that ArGi was well-functioning, independent, and walking with only a slight gait.[264] Nothing in Michael Jones' file suggested ArGi needed skilled nursing or had any condition

---

[258] R. Doc. 1015 at 177.
[259] R. Doc. 1108 at 264.
[260] R. Doc. 45 at 36.
[261] R. Doc. 1110 at 117.
[262] R. Doc. 1067.
[263] R. Doc. 670.
[264] R. Doc. 1474 at 16–18.

that would make him a candidate for home health.[265] Nor did ArGi's patient files from his primary care physician, Dr. Timpson, demonstrate a need for home health.[266] Nevertheless, Jones certified ArGi for home health.

Michael Jones billed several episodes of home health for patient LiSc.[267] Michael Jones' patient charts and code billing were introduced at trial, showing Michael Jones certified LiSc for home health based on benign hypertension and rheumatoid arthritis beginning April 26, 2013.[268] Dr. Lutz testified there was no evidence in Jones' patient file to suggest LiSc suffered from these conditions and no evidence to support home health certification.[269] Medicare billing showed Michael Jones billed codes indicating he was doing complicated multidisciplinary care plan oversight beginning in June 2013, when his first patient visit with LiSc did not take place until November of that year.[270]

As to patient EvLa, Verinese Sutton testified she provided care for EvLa, who lived in the group home Ms. Sutton managed.[271] According to Sutton, EvLa suffered from mental disabilities requiring her to take medication and be monitored by medical staff, but EvLa was able to and did leave the group home often with her family members.[272] The patient's father testified that he regularly took EvLa to appointments, out to eat, and to visit family members.[273] Leanne Dodson testified that an individual performing these activities, whose psychiatric condition was stable, would be disqualified from receiving

---

[265] *See* Gov. Exh. 582.
[266] *See* Gov. Exh. 581.
[267] R. Doc. 1096 at 127–28; *see also* Gov. Exh. 962.
[268] *Id.* at 128.
[269] *Id.* at 132.
[270] *Id.* at 132–33; *see* Gov. Exh. 960.
[271] R. Doc. 1473 at 11.
[272] *Id.* at 11–13.
[273] *Id.* at 13.

home health services.[274] Nevertheless, Michael Jones billed one episode of home health for EvLa.[275]

Testimony at trial plainly demonstrated that Michael Jones acted with the requisite intent to defraud. In *United States v. Gibson*,[276] the Fifth Circuit found "powerful" the evidence that a defendant tracked the number of billable patients and sought to "keep [the] census up."[277] In this case, Sylvia Walker testified that Michael Jones asked her to keep him informed of his referrals to Abide by sending him periodic text messages tracking the referrals.[278] Walker testified that she informed Michael Jones whether patients had been admitted, but in her opinion Michael Jones, as their doctor, should already have had this information.[279] Leanne Dodson testified that it would be highly unusual for a physician to track his own referrals to a home health agency,[280] and that she had never seen a doctor track his own referrals in this way.[281]

As the Government correctly argues, these messages to Jones informing him that patients he referred to Abide were already receiving home health care from other agencies "demonstrated that Michael Jones had not seen the patients prior to referring them to Abide because often he was unaware they were already with other home health agencies."[282] Taylor testified that Michael Jones reported he was not referring enough

---

[274] *See* R. Doc. 1099 at 7.
[275] Trial Exhibit 714.
[276] 875 F.3d 179 (5th Cir. 2017).
[277] *Id.* at 185.
[278] R. Doc. 1431 at 12, 23, 28, 31.
[279] *Id.* at 42.
[280] R. Doc. 1477 at 5. A doctor legitimately referring a patient for home health would have no interest in where the patient ultimately sought care.
[281] *Id.* at 5.
[282] R. Doc. 1147 at 17.

patients to Abide to satisfy Crinel.[283] This evidence demonstrates Michael Jones' desire to "keep [the] census up."[284]

The statistical evidence presented by Dr. Tumulesh Solanky also supports the jury's verdict with respect to Michael Jones. As discussed above, Dr. Solanky focused on the seven billing codes associated with case-mixed diagnoses,[285] which the Government's witnesses testified Abide used to increase its Medicare's reimbursement. He testified there is a statistically significant difference between the national and Louisiana percentages of patients with these seven diagnoses and the percentage of Barnes, Evans, Molden and Jones patients with these seven diagnoses.[286] For example, in Louisiana, ninety-eight percent of providers had nine or fewer beneficiaries with the stomach function disorder diagnosis code.[287] Whereas, in contrast, fifty-six percent of Abide patients had this code diagnosis,[288] and thirty-four percent of Michael Jones' patients had this diagnosis.[289]

Michael Jones' motion for judgment of acquittal as to Counts 18, 22, 23, 24, 25, 26, and 27 is denied.

Conclusion

Contrary to Michael Jones' arguments, the Government presented abundant evidence at trial establishing his guilt, and the jury reasonably concluded he was guilty on counts 1, 2, 18, and 22–27. The testimony against Michael Jones, viewed in the light most

---

[283] R. Doc. 1045 at 34.
[284] *Gibson*, 875 F.3d at 185.
[285] *Id.* at 14.
[286] *Id.* at 40.
[287] *Id.* at 43.
[288] *Id.*
[289] *Id.*

favorable to the Government, is sufficient for the jury to have found the essential elements of all offenses to be satisfied beyond a reasonable doubt.

### 4. Gregory Molden

Defendant Gregory Molden was found guilty of Counts 1 and 2 for conspiracy, and Counts 32 through 42 for health care fraud.[290] Molden challenges his guilty verdicts on the ground that the Government failed to prove beyond a reasonable doubt the existence of a conspiracy between Molden and Crinel.[291] For example, Molden argues, without citation, "the Government's leading witness testified repeatedly that Dr. Molden had no knowledge and, hence, no AGREEMENT, that any illegal activities were taking place within Abide."[292] He asserts further, "the Government relied solely on inferences to support the fraud charge and attempted to use those same inferences to support a larger agreement."[293] Molden appears to reference Lisa Crinel's testimony when he argues, "The Government's theory is void of testimonial support, destroyed as it was by their own [witness's] testimony."[294]

Counts 1 and 2 - Conspiracy

Because the conspiracy to pay health care kickbacks was associated with the larger conspiracy to defraud Medicare, much of the evidence for counts 1 and 2 is overlapping. As with Barnes, Gregory Molden's main argument in favor of his motion for acquittal as to these counts is that no reasonable juror could have convicted him of conspiracy when Lisa Crinel testified that there was no conspiracy.[295] As with Barnes, Molden neglects to

---

[290] R. Doc. 1067.

[291] R. Doc. 1437 at 1. Defendant Gregory Molden's Motion for Judgment of Acquittal incorporates the arguments made in the addendum to his sentencing memorandum. *See* R. Doc. 1437 at 2.

[292] R. Doc. 1421 at 2 (emphasis in original).

[293] R. Doc. 1421 at 3.

[294] *Id.*

[295] R. Doc. 1074-1 at 5.

mention that Lisa Crinel accepted responsibility for committing health care fraud on behalf of herself and Abide[296] and pleaded guilty to the conspiracy to commit health care fraud and the conspiracy to pay and receive illegal kickbacks from 2008 to 2014.[297] As mentioned above, Lisa Crinel specifically pleaded guilty to conspiring with Shelton Barnes, Henry Evans, Michael Jones, and Gregory Molden,[298] and testified that she paid kickbacks to them and they signed false invoices to cover up the kickbacks.[299] The doctors agreed to sign 485s for patients who were not under their care and who were not eligible for home health care and to refer these patients to Abide.

Testimony and documentary evidence confirm that Molden agreed to refer patients to Abide for home health services in exchange for monthly payments. Lisa Crinel testified that, after Molden terminated his earlier relationship with Jobie Crear, she contacted Molden to ask him to sign home health orders.[300] In this conversation, Molden requested that they establish a financial arrangement before he would sign for her patients.[301] Crinel testified that Molden asked how much Crinel was paying Shelton Barnes, and Molden demanded an additional $1,500 over what Barnes was being paid.[302] Crinel testified that Molden said "Well, for $5,000 I'll be happy to work with you."[303] Crinel testified that she agreed to pay him $5,000 per month,[304] and Molden signed a medical consulting agreement with Abide in July 2011.[305] Trial Exhibit 342 is a Medical

---

[296] R. Doc. 1110 at 73.
[297] R. Doc. 1108 at 36–37, R. Doc. 1110 at 69.
[298] R. Doc. 1110 at 70.
[299] *Id.* at 101–02.
[300] R. Doc. 1108 at 189; R. Doc. 11o9 at 280 ("I initiated the phone call because I had orders that needed to be signed.").
[301] R. Doc. 1108 at 189; R. Doc. 1109 at 265–66.
[302] R. Doc. 1108 at 189–90; R. Doc. 1109 at 281.
[303] R. Doc. 1109 at 281.
[304] R. Doc. 1108 at 190–91.
[305] *See* Gov. Exh. 342.

Consultant Agreement between Abide and Molden. Trial Exhibit 345 includes Abide's monthly checks to Molden in the amount of $5,000. Lisa Crinel and Wilneisha Jakes took the contract and his first check to his office to get his signature.[306] Lisa Crinel testified that she was paying Molden for him to refer patients to Abide.[307] At some point, the monthly amount paid to Molden was reduced to $3,500 because the number of patients he was referring decreased.[308]

Documentary evidence introduced at trial corroborated Crinel's narrative. The Government introduced checks showing that Molden received $43,500 from Abide between July 2011 and November 2012.[309] Medicare records introduced at trial showed that Molden sent twenty-five patients for repeated episodes of home health at Abide starting in July 2011.[310]

Molden's medical consulting agreement listed various duties that Molden was to perform,[311] but Crinel testified he did not in fact perform these duties, and she never asked him to.[312] Testimony by Wilneisha Jakes proved that Abide's payments to Molden were solely for patient referrals, and were unrelated to any ostensible responsibilities listed in his medical directorship agreement:

> Q: Do you recall how much Doctor Molden got paid at the beginning of his contract?
> A: Yes, he was getting paid $5,000 a month.
> Q: What were you paying him for?
> A: We was paying him for patient referrals."[313]

---

[306] R. Doc. 1108 at 190.
[307] R. Doc. 1109 at 277.
[308] R. Doc. 1108 at 201.
[309] *See* Gov. Exh. 345.
[310] *See* Gov. Exh. 1447.
[311] For example, the agreement required Molden to "[a]ssist the agency in the development of procedures, methodologies and practices specific for the population of patients geographically arranged to the agency." Gov. Exh. 342 at Bates 023385.
[312] R. Doc. 1109 at 263–65.
[313] R. Doc. 1015 at 144–45.

Molden argued he received payments from Abide because he was "available" to Abide, but several Abide staff members testified that they never saw Molden come to Abide to review files or patients charts or attend staff meetings, and they never called him with questions about patients.[314] Wendy Ervin testified Molden did not come to Abide to review patient charts and she did not send him nurses' notes.[315] She could recall Molden performing only two in-service sessions at Abide.[316] On the two known occasions when Molden performed in-services for the Abide staff, Molden demanded Crinel pay him additional money above his $5,000 monthly medical director fee.[317]

Lisa Crinel's testimony in this case proves an express agreement between Crinel and Molden to conspire to commit health care fraud in exchange for kickbacks. Further, Molden's acknowledgment of Defendant Barnes' arrangement with Abide, and his demands for a more lucrative deal, show that Molden understood the unlawful nature of the scheme. In short, the evidence provides overwhelming proof that Molden's relationship with Crinel and Abide constituted conspiracies to defraud Medicare and to pay and receive illegal health care kickbacks.

Gregory Molden's Motion for Judgment of Acquittal is denied as to Counts 1 and 2.

Counts 32 Through 42 – Health Care Fraud

The Court finds the Government's evidence more than sufficient for the jury to find Molden guilty of health care fraud. Molden was convicted on Counts 32 through 37, which relate to patient KeTr, and Counts 38 through 42, which relate to patient ShBe. The

---

[314] *See, e.g.*, R. Doc. 1472 at 22–23; R. Doc. 1428 at 18–19.
[315] R. Doc. 1472 at 22–23.
[316] R. Doc. 1472 at 23. According to Abide employee Wendy Ervin, an in-service is "a training where we would get different people in [the] health care industry [to] come in and just educate us on [issues such as] medical equipment or [] different diseases." *Id.* at 17.
[317] R. Doc. 1109 at 267; R. Doc. 1108 at 202.

evidence put forward at trial establishes that these patients were not in need of home health care and Molden acted with intent to defraud.

With regard to KeTr, Molden's own records indicate that KeTr traveled to Molden's office almost every month for the fifteenth months prior to his home health certification.[318] These records suggest that KeTr was not, in fact, home-bound at this time.[319] The Government's witness Dr. Lutz testified that KeTr's condition did not change immediately prior to his home health certification,[320] and that the reasons Molden stated as requiring home health—diabetes and blood pressure—were properly managed at the time of the referrals and did not warrant home health.[321] Rather, the evidence showed the only relevant change preceding KeTr's certification for home health was that Abide started paying Molden a medical director fee approximately one month before KeTr's referral to Abide.[322]

The face-to-face form required by Medicare indicated Molden was referring KeTr for home health because of his Type II Diabetes and his "variations in blood glucose level."[323] According to Molden's patient chart, however, Molden only tested KeTr's blood glucose level once before referring him to home health.[324] Further, Dr. Lutz testified that KeTr's blood sugar was under control at that time.[325] Molden recertified KeTr for home health in November 2011 based on hypertension.[326] According to Dr. Lutz's testimony, however, KeTr's blood pressure was "well controlled" at this time."[327]

---

[318] *See* Gov. Exh. 1040.
[319] *Id.*
[320] R. Doc. 1096 at 24–25.
[321] *Id.* at 25–26, 29.
[322] Gov. Exh. 345.
[323] Gov. Exh. 1041 at Bates 312950.
[324] Gov. Exh. 1040.
[325] R. Doc. 1096 at 16.
[326] Gov. Exh. 1042.
[327] R. Doc. 1096 at 35.

45

As to ShBe, the evidence at trial showed that Molden certified seventeen episodes of home health based on diagnoses of hypertension, rheumatoid arthritis, and "stomach function disorder."[328] Dr. Lutz testified that "[Molden] certified that [ShBe] needed home health for hypertension, but yet in his records the blood pressures were all controlled."[329] Dr. Lutz testified that in his review of Molden's patient records, he saw no indication that ShBe had rheumatoid arthritis and no evidence that she had any serious stomach issues.[330] Finally, Dr. Lutz testified that he saw no evidence of any stomach issues with ShBe, other than a reference to her needing mild over-the-counter medicine.[331]

The statistical evidence presented by Dr. Tumulesh Solanky also supports the jury's verdict with respect to Gregory Molden. As discussed above, Dr. Solanky focused on the seven billing codes associated with case-mixed diagnoses,[332] which the Government's witnesses testified Abide used to increase its Medicare's reimbursement. He testified that there is a statistically significant difference between the national and Louisiana percentages of patients with these seven diagnoses and the percentage of Barnes, Evans, Molden and Jones patients with these seven diagnoses.[333] For example, in Louisiana, ninety-eight percent of providers had nine or fewer beneficiaries with the stomach function disorder diagnosis code.[334] Whereas, in contrast, fifty-six percent of Abide patients had this code diagnosis,[335] and eighty percent of Gregory Molden's patients had this diagnosis.[336]

---

[328] Gov. Exh. 432. According to Dr. Lutz, "stomach function disorder is a grab bag of anything wrong with the stomach and it's not a very specific thing, . . . it's a nonspecific diagnosis." R. Doc. 1096 at 177.
[329] R. Doc. 1096 at 167.
[330] *Id.* at 167–68.
[331] *Id.*
[332] *Id.* at 14.
[333] *Id.* at 40.
[334] *Id.* at 43.
[335] *Id.*
[336] *Id.*

Gregory Molden's motion for judgment of acquittal as to counts 32 through 42 is denied.

Conclusion

Contrary to Molden's arguments, the Government presented abundant evidence at trial establishing his guilt, and the jury reasonably concluded he was guilty on the counts charged against him. The testimony against Molden, viewed in the light most favorable to the Government, is sufficient for the jury to have found the essential elements of all offenses to be satisfied beyond a reasonable doubt.

5. Paula Jones

Defendant Paula Jones was convicted on Counts 1 and 2 for conspiracy.[337] She moves for Judgment of Acquittal under Rule 29 on the grounds that the Government has failed to prove each element of these charges beyond a reasonable doubt.[338] Paula Jones argues that her circumstances differ from those of her co-defendants because she was not involved in the clinical side of Abide's business; unlike the Defendant doctors, she did not have a medical directorship or otherwise treat patients.[339] As a result, Paula Jones contends "the entire case against her is that she was a biller at Abide, that she received a raise, and that she was married to a doctor who referred patients to Abide."[340] Paula Jones asserts that because the Government has not presented evidence she was "in any way involved in the clinical side of Abide's business," no reasonable jury could have found her guilty.[341] She contends no witness testified that she agreed to conspire to defraud Medicare, and no witness testified that she knew of the "alleged wrongful reason for her

---

[337] *See* R. Doc. 1067.
[338] R. Doc. 1087-1 at 4.
[339] *Id.*
[340] *Id.*
[341] *Id.*

pay increase."[342] Further, she argues there was no testimony that she knew any of the patients were not homebound or should not be certified for care.[343] She argues she had no medical training, and relied on the clinical staff to make medical diagnoses, and she "merely billed this input as given to her from the clinical staff at Abide."[344]

Counts 1 and 2 - Conspiracy

Because the conspiracy to pay health care kickbacks was associated with the larger conspiracy to defraud Medicare, much of the evidence for counts 1 and 2 is overlapping. The evidence at trial proved Paula Jones played an integral role in the conspiracy. Paula Jones' job description at Abide was to prepare and submit claims to insurance companies, including Medicare, and to identify and resolve billing complaints. Mark Dyer testified that Paula Jones was the "lead" biller at Abide.[345] Lisa Crinel testified that Paula Jones was a valuable employee.[346] As the lead biller at Abide, there is no question Paula Jones participated in the Abide billings.

Documentary evidence—revenue reports generated by Paula Jones in Abide's Kinnser Software system[347]—proved she was aware of Abide's improper use of case mix diagnosis goals. Mark Dyer determined that $2,100 per 60 day episode of home health care was the amount Abide needed to bill to break-even on administrative and field costs.[348] Lisa Crinel testified that Paula Jones met weekly with Mark Dyer to discuss Abide's per-episode revenue.[349] Crinel testified that, if the amount billed per episode fell

---

[342] R. Doc. 1439 at 3.
[343] *Id.*
[344] *Id.* at 4.
[345] R. Doc. 1111 at 82.
[346] R. Doc. 1108 at 210.
[347] Gov. Exh. 375.
[348] R. Doc. 1108 at 218–19.
[349] *Id.* at 218–20.

below $2,100, Paula Jones instructed Abide's case managers to refigure the patient records to increase reimbursement amounts.[350] Case manager Linda Frazier Johnson testified the case managers would then adjust diagnosis codes to maximize payment from Medicare.[351] Documents at trial showed that of 179 home health episodes, 135 set the revenue goals set by Dyer and implemented by Paula Jones.[352] By acting as an intermediary between Crinel, Dyer, and the case managers, Paula Jones orchestrated much of the fraudulent billing. This conduct plainly constituted acts in furtherance of a conspiracy to defraud Medicare.[353]

Additional evidence proved Paula Jones was aware of the unlawful nature of Abide's activities. Sylvia Walker testified that Paula Jones and Eartha Ringo, the other Abide biller, had a "911" code they intended to text each other in the event the federal authorities raided the Abide offices.[354]

Wilneisha Jakes testified that Paula Jones knew doctors were being paid for referrals.[355] Jakes further testified that Michael Jones' unique kickback arrangement was explained to Paula Jones in person at a meeting between Jakes, Crinel, and Paula Jones.[356] Crinel testified that, when she explained the arrangement to Paula Jones, Jones said "that was fine; but that was an arrangement between me and Michael."[357] Crinel testified that when she grew frustrated with the paucity of Michael Jones' referrals, she complained to Paula Jones, who responded, "That's between you and Michael and I'm not

---

[350] *Id.*
[351] R. Doc. 1428 at 9–12.
[352] *See* Gov. Exh. 375.
[353] *Murthil*, 679 F. App'x at 349 (holding that a jury may infer intent to defraud Medicare when biller who was responsible for preparing the bills that go to Medicare and was trained in health care regulations, knowingly kept track of fraudulent diagnoses).
[354] R. Doc. 1431 at 51.
[355] R. Doc. 1015 at 79.
[356] *Id.* at 172–73.
[357] R. Doc. 1110 at 46.

going to get involved in that."[358] Lisa Crinel testified that Paula Jones never asked why her salary was being doubled.[359]

The evidence at trial clearly shows Paula Jones' salary at Abide was a thinly veiled kickback arrangement for her husband's referrals. Paula Jones started working for Abide in July of 2012 at a salary of $45,000 per year.[360] She split her time between the Abide office and her husband's office.[361] After Crinel's meeting with Michael Jones at the Rum House, in which Michael Jones agreed to send patient referrals to Abide in exchange for an increase in Paula Jones' salary, her salary in fact doubled. Lisa Crinel testified that Paula Jones' salary increase and promotion were not related to Paula Jones' performance, but were instead in exchange for Michael Jones' promise to refer patients to Abide.[362] Crinel testified:

> Q: So was anybody other than Paula Jones getting raises in this period of time?
> A: No, ma'am.
> Q: Was the raise that you gave Paula Jones a performance-related raise?
> A: No, it wasn't.
> Q: Okay. What was it for?
> A: For Michael Jones to send an abundance of patients to the agency.[363]

Mark Dyer corroborated this testimony when he said that Paula Jones' duties did not change after she was designated as CFO.[364]

Paula Jones may have avoided overt discussions regarding the kickback conspiracy, but that does not shield her from guilt. The evidence establishes that she willingly and knowingly entered into a conspiracy to defraud Medicare in exchange for

---

[358] R. Doc. 1108 at 253.
[359] *Id.* at 253.
[360] Gov. Exh. 365.
[361] R. Doc. 1108 at 209.
[362] R. Doc. 1110 at 74–75.
[363] R. Doc. 1108 at 248.
[364] R. Doc. 1111 at 30.

kickbacks in the form of her increased salary, even if the agreement was "silent and informal."[365]

Paula Jones' motion for judgment of acquittal[366] as to Counts 1 and 2 is denied.

Conclusion

Contrary to Paula Jones' arguments, the Government presented abundant evidence at trial establishing her guilt, and the jury reasonably concluded she was guilty on the counts charged against her. The testimony against Paula Jones, viewed in the light most favorable to the Government, is sufficient for the jury to have found the essential elements of all offenses to be satisfied beyond a reasonable doubt.

### 6. Jonathon Nora

Defendant Jonathon Nora was convicted on Counts 1 and 2 for conspiracy and Count 27 for health care fraud (patient EvLa).[367] In his Motion for Judgment of Acquittal, Nora argues that the evidence presented at trial is insufficient to show that he was involved in a conspiracy or had any intent to defraud.[368] He asserts there was no evidence he "was engaged in any agreement, express or tacit, to engage in any enterprise to commit any sort of fraud."[369] As a result, "there was no evidence to the effect that he had the sort of intent necessary to commit the single substantive offense with which he was charged."[370] In support, Nora relies almost entirely on the testimony of Lisa Crinel in

---

[365] *Gibson*, 875 F.3d at 186.
[366] R. Doc. 1087.
[367] R. Doc. 1067.
[368] R. Doc. 1080.
[369] R. Doc. 1080-1 at 4.
[370] *Id.*

which she stated "I never thought I had a conspiracy going on."[371] Nora further asserts Crinel testified that she never paid Nora a referral fee.[372]

<u>Counts 1 and 2 - Conspiracy</u>

Because the conspiracy to pay health care kickbacks was associated with the larger conspiracy to defraud Medicare, much of the evidence for counts 1 and 2 is overlapping. As with Barnes, Jonathan Nora's main argument in favor of his motion for acquittal as to these counts is that no reasonable juror could have convicted him of conspiracy when Lisa Crinel testified that there was no conspiracy.[373] As with Barnes, Nora neglects to mention that Lisa Crinel accepted responsibility for committing health care fraud on behalf of herself and Abide[374] and pleaded guilty to the conspiracy to commit health care fraud and the conspiracy to pay and receive illegal kickbacks from 2008 to 2014.[375] Lisa Crinel testified that Nora was Abide's intake person and it was his job to verify each patient's Medicare eligibility and to assign the patient to a field nurse.[376] Lisa Crinel also testified that, after a health fair, the patient registration sheets were given to Jonathan Nora for him to call the patient and offer home health care through a house doctor without his ever speaking to a physician.[377] Jonathan Nora also investigated and determined client benefit coverage and completed referral forms for patients.[378] Lisa Crinel testified that, if a patient's primary care physician said that home health was not necessary, Nora would call the patient and say that he or she could still get home health care but would need a

---

[371] R. Doc. 1110 at 50.
[372] R. Doc. 1080-1 at 3.
[373] R. Doc. 1074-1 at 5.
[374] R. Doc. 1110 at 73.
[375] R. Doc. 1108 at 35–36, R. Doc. 1110 at 69.
[376] R. Doc. 1110 at 90.
[377] R. Doc. 1108 at 109–12; R. Doc. 1109 at 13–14.
[378] R. Doc. 1109 at 14–16.

different physician.[379] If a patient's primary care physician did not think the patient was eligible for home health care, Nora would send them to a house doctor,[380] and arrange for a home visit with the patient.[381] Lisa Crinel testified that Jonathan Nora, in effect, replaced the judgment of the patient's primary care physician with his own.[382]

Multiple witnesses, in addition to Lisa Crinel, described Jonathon Nora's role in the conspiracy. Wilneisha Jakes testified that Nora was responsible for the admissions and referrals at Abide, and would assign patients to "house doctors" if the patient did not have a primary care physician.[383] Wendy Ervin testified that she and Nora were responsible for handling Abide's patient referrals,[384] and that in her absence Nora tracked the referrals.[385]Rhonda Maberry testified that, after Wendy Ervin left Abide, she received the list of patients she was to see from Jonathan Nora.[386] Ervin testified that, if a patient came in from a marketer and did not have a primary care physician, she and Nora assigned the patient to Rhonda Maberry and Shelton Barnes.[387] Wilneisha Jakes testified Nora, like Paula Jones, knew doctors were being paid for their referrals.[388] Beverly Mandolph testified Nora told her she could be paid for referring patients to Abide.[389] Shontrell Guzman, who owned a group home, testified that she called Jonathan Nora to give him information about new patients.[390] Thereafter, she would receive a referral fee.[391] Verinese Sutton, who also

---

[379] *Id.* at 21–24.
[380] *Id.* at 30.
[381] *Id.* at 21.
[382] R. Doc. 1110 at 113.
[383] R. Doc. 1015 at 49–50.
[384] R. Doc. 1472 at 9.
[385] *Id.* at 11.
[386] R. Doc. 1424 at 58–59.
[387] R. Doc. 1472 at 7.
[388] R. Doc. 1015 at 79.
[389] *See* R. Doc. 1480 at 5.
[390] R. Doc. 1481 at 7.
[391] *Id.*

owned a group home, testified that she called Jonathan Nora was her contact at Abide.[392] Eleshia Williams testified that she worked at health fairs for Abide and received checks from Jonathan Nora in exchange for referring patients to Abide.[393]

Gaynell Leal, a former Abide employee, testified that she and Nora engaged in patient "ghosting," which involved discharging patients who had been in home health so long that Medicare might take notice, and readmitting the patients after a period of time passed.[394] As Wendy Ervin explained, by ghosting patients, Nora and Leal furthered the conspiracy by allowing Abide to retain their home health care patients without triggering a Medicare audit.[395] Gaynell Leal testified that, although these patients were discharged for a period of time on Abide's records, she and Nora told Abide nurses to provide home health services to the patients anyway.[396] Crinel corroborated the substance of the ghosting process.[397]

As to Count 2, trial evidence showed that Jonathon Nora played an important role in coordinating Abide's kickback relationships. According to testimony by Wendy Ervin, Wilneisha Jakes, and Beverly Mandolph, Jonathon Nora kept track of patient referrals, distributed referral checks, and communicated the money-for-referrals scheme to other members of the conspiracy.[398] These actions demonstrate that Jonathon Nora knowingly participated in the Abide scheme.

Jonathon Nora's motion for judgment of acquittal as to Counts 1 and 2 is denied.

---

[392] R. Doc. 1473 at 8.
[393] R. Doc. 1456 at 38.
[394] R. Doc. 1429 at 19–20.
[395] See R. Doc. 1472 at 13–14.
[396] R. Doc. 1429 at 18–22.
[397] R. Doc. 1110 at 75–77.
[398] *See, e.g.*, R. Doc. 1015 at 51.

<u>Count 27 – Health Care Fraud</u>

Jonathon Nora was found guilty on Count 27, [399] which relates to patient EvLa, who resided in Verinese Sutton's group home.[400] As with Counts 1 and 2, Nora's main argument in favor of his motion for acquittal as to Count 27 is that no reasonable juror could have convicted him of conspiracy when Lisa Crinel testified that there was no conspiracy.[401] As mentioned above, Nora neglects to mention that Lisa Crinel accepted responsibility for committing health care fraud on behalf of herself and Abide[402] and pleaded guilty to the conspiracy to commit health care fraud and the conspiracy to pay and receive illegal kickbacks from 2008 to 2014.[403]

Sutton testified that Jonathan Nora was her contact at Abide.[404] She testified that she referred patients to Abide for home health care in exchange for a referral fee.[405] Sutton testified she would go to Abide to pick her referral fees, and they were usually delivered to her by Nora.[406]

Sutton also testified that, when she started referring patients to Abide, she would:

"talk to Jonathan Nora or Sylvia and I would give them the client's information and they would check to see if their number—if they wasn't with another home health agency or else they would put them with, you know, them and then they would send a nurse out to assess the clients and then after that Jonathan would call the doctor—Dr. Jones' office, then Dr. Jones' office would call with appointment and a time that they would pick up the clients."[407]

---

[399] R. Doc. 1067. Michael Jones was also found guilty on Count 27.
[400] R. Doc. 1473 at 11.
[401] R. Doc. 1074-1 at 5.
[402] R. Doc. 1110 at 73.
[403] R. Doc. 1108 at 35−36, R. Doc. 1110 at 69.
[404] R. Doc. 1473 at 8.
[405] *Id.* at 7−8.
[406] *Id.* at 10−11.
[407] *Id.* at 8.

As discussed above with respect to Counts 1 and 2, evidence at trial established that Nora was the Abide employee who received calls about referrals and arranged for patients to see house doctors. Lisa Crinel testified that Nora was Abide's intake person and it was his job to verify each patient's Medicare eligibility and to assign the patient to a field nurse.[408] Nora also investigated and determined client benefit coverage and completed referral forms for patients.[409] Wilneisha Jakes testified that Nora was responsible for the admissions and referrals at Abide, and that he would assign patients to "house doctors" if the patient did not have a primary care physician.[410] Wilneisha Jakes testified Nora, like Paula Jones, knew doctors were being paid for their referrals.[411] Beverly Mandolph testified Nora told her she could be paid for referring patients to Abide.[412] Shontrell Guzman, who owned a group home, testified that she called Jonathan Nora to give him information about new patients.[413] Thereafter, she would receive a referral fee.[414]

As to patient EvLa, Verinese Sutton testified she provided care for EvLa.[415] Evidence at trial established that patient EvLa, in fact, was referred by Abide to house doctor Michael Jones, and Michael Jones billed one episode of home health for EvLa,[416] even though she was able to and did leave the group home often with her family members.[417] According to Sutton, EvLa suffered from mental disabilities requiring her to take medication and be monitored by medical staff. The patient's father testified that he

---

[408] R. Doc. 1110 at 90.
[409] R. Doc. 1109 at 14–16.
[410] R. Doc. 1015 at 49–50.
[411] *Id.* at 79.
[412] *See* R. Doc. 1480 at 5.
[413] R. Doc. 1481 at 7.
[414] *Id.*
[415] R. Doc. 1473 at 11.
[416] Trial Exhibit 714.
[417] *Id.* at 11–13.

regularly took EvLa to appointments, out to eat, and to visit family members.[418] Leanne Dodson testified that an individual performing these activities, whose psychiatric condition was stable, would be disqualified from receiving home health services.[419]

In *United States v. Murthil*, office manager Joe Ann Murthil was convicted conspiracy to commit healthcare fraud, conspiracy to pay and receive health care kickbacks, and health care fraud.[420] The Fifth Circuit affirmed her convictions saying, with respect the health care fraud count, "Murthil's conviction for substantive fraud under 18 U.S.C. § 1347, the evidence is also sufficient. Morad testified that Murthil was responsible for billing Medicare and that Medicare was billed for patient Joann Bush, despite Murthil and Morad having earlier discussed that Bush was not homebound."[421]

In this case, evidence at trial established that Nora was responsible for handling referrals and sending patients to house doctors to be admitted to home health care, regardless of their eligibility. EvLa's father described her routine activities, and Leanne Dodson testified that an individual capable of those activities would not qualify for home health care. EvLa was certified for home health care by Michael Jones, an Abide house doctor, and was provided home health services by Abide. Michael Jones billed one episode of home health care for EvLa.

Accepting all reasonable inferences which tend to support the Government's case, and viewing the evidence in the light most favorable to the prosecution, a rational jury could have found the essential elements of the offense to be satisfied beyond a reasonable doubt.

---

[418] *Id.* at 13.
[419] *See* R. Doc. 1099 at 7.
[420] 679 F. App'x at 346.
[421] *Id.* at 349.

Defendant Jonathon Nora's motion for judgment of acquittal on Count 27 is denied.[422]

Conclusion

Contrary to Nora's arguments, the Government presented sufficient evidence at trial establishing his guilt, and the jury reasonably concluded he was guilty on the counts charged against him. The testimony against Nora, viewed in the light most favorable to the Government, is sufficient for the jury to have found the essential elements of all offenses to be satisfied beyond a reasonable doubt.

## II.    Motions for a New Trial

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[423] "The power to grant a new trial should be exercised infrequently by district courts, unless warranted by exceptional circumstances."[424] In the Fifth Circuit, "the generally accepted standard is that a new trial ordinarily should not be granted unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict."[425] "A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant."[426] "A motion for a new trial is based on the presumption that the verdict against the defendant is valid; therefore the burden is on the

---

[422] R. Doc. 1080.

[423] FED. R. CRIM. P. 33(a).

[424] *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (internal quotation marks and citations omitted)).

[425] *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011) (citing *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004)).

[426] *Id.*

defendant to demonstrate that a new trial ought to be granted."[427] Furthermore, in reviewing a motion for a new trial "the harmless error rule is usually appropriate."[428]

A.  The Verdict Was Not Against the Weight of the Evidence

The Defendants argue they are entitled to new trials because the jury's verdict was against the manifest weight of the evidence. Unlike a Rule 29 motion, which requires the Court to view the evidence in the light most favorable to the verdict, the standard under Rule 33 is more lenient. Under Rule 33, "the trial judge may weigh the evidence and may assess the credibility of the witnesses during its consideration of the motion for new trial."[429]

In the Fifth Circuit, "the generally accepted standard is that a new trial ordinarily should not be granted unless there would be a miscarriage of justice or the weight of the evidence preponderates against the verdict."[430] The district court must weigh the evidence and assess the credibility of witnesses, but must not entirely usurp the jury's function or set aside a verdict merely because it disagrees with the result.[431]

The Fifth Circuit has explained:

Setting aside a jury's guilty verdict in the interests of justice may be appropriate under circumstances where the evidence brought forth at trial may tangentially support a guilty verdict, but in actuality, preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred . . . . Similarly, while vested with discretion to grant a new trial pursuant to Rule 33 if necessary in accordance with the interests of

---

[427] 3 CHARLES ALAN WRIGHT, NANCY J. KING & SUSAN R. KLEIN, FEDERAL PRACTICE & PROCEDURE: CRIMINAL 4d § 581 (4th ed 2011).
[428] *United States v. Eli*, 96 F.3d 1443 (5th Cir. 1996) (quoting *United States v. Logan*, 861 F.2d 859, 864 n.3 (5th Cir. 1988)); *see also United States. v. Mendoza-Mendina*, 346 F.3d 121, 127 (5th Cir. 2003) ("[U]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required.").
[429] *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997) (citing *Tibbs v. Florida*, 457 U.S. 31, 37–38 (1982)).
[430] *Wright*, 634 F.3d at 775.
[431] *Tarango*, 396 F.3d at 672.

justice, we have observed that this power should be exercised infrequently by district courts, unless warranted by exceptional circumstances.[432]

The Court incorporates its findings and its summary of the evidence as described above in denying the Defendants' Rule 29 motions. Weighing the evidence and assessing the credibility of the witnesses under the Rule 33 framework, the Court finds that, as to each Defendant, the evidence preponderates heavily in favor of the verdict. The jury's verdict is not merely "tangentially" supported by the evidence. Rather, the overwhelming evidence, which includes direct testimony by Lisa Crinel and numerous other co-conspirators and is corroborated by documentary exhibits, directly supports the jury's guilty verdict as to each Defendant. As such, the Court finds that the interests of justice do not require a new trial for any Defendant.

### B.  No Error Was Committed with Respect to Expert Testimony

The Defendants also argue they are entitled to a new trial based on various alleged errors related to the testimony offered by the Government's expert witnesses at trial. The Government called three expert witnesses to testify at trial: (1) Dr. Brobson Lutz, an expert in internal medicine and medical necessity of home health[433]; (2) Leanne Dodson, an expert in the "standards and practices governing the documentation and billing of home health care services and Medicare's eligibility requirements; and (3) Dr. Tumulesh Solanky, an expert in statistics and probability.

Prior to trial, Defendant Shelton Barnes filed a motion *in limine*,[434] to which Defendants Michael Jones[435] and Henry Evans[436] joined, seeking to preclude the

---

[432] *Id.* (internal citations omitted).
[433] Dr. Lutz was also called to testify as a fact witness with respect to one patient, "who was . . . actually his patient." R. Doc. 832 at 2.
[434] R. Doc. 777.
[435] R. Doc. 779.
[436] R. Doc. 787.

Government from calling two of its experts, Ms. Dodson and Dr. Lutz, at trial to testify as fact witnesses and to prohibit them from testifying as to the governing law. Defendant Shelton Barnes[437] also filed a motion *in limine*, to which Defendant Michael Jones[438] joined, moving the Court to exclude the use of statistical evidence by the Government. On October 27, 2016, the Court held Oral Argument regarding the Defendants' motions *in limine*.[439] From the bench, the Court denied Defendant Shelton Barnes' motion to exclude statistical evidence and granted in part and denied in part Defendant Shelton Barnes' motion to preclude the Government from calling its other two expert witnesses at trial.[440] The Court ruled that Dr. Solanky would be allowed to provide expert statistical testimony.[441] The Court also ruled that both Ms. Dodson and Dr. Lutz would be allowed to testify as experts, and that Dr. Lutz would be allowed to testify as a fact witness with respect to the one patient he treated.[442] The Court allowed Ms. Dodson to testify about national averages with respect to episodes, as compared to the number of episodes per patient seen by doctors in this case, because this testimony was not considered by the Court to be a statistical analysis, but precluded her from testifying that certain conduct amounted to fraud.[443]

The Court will address the arguments raised by the Defendants as to each of the Government's expert witnesses who testified at trial.

---

[437] R. Doc. 726.

[438] R. Doc. 765.

[439] R. Doc. 832.

[440] *Id.*

[441] *Id.*

[442] The Court allowed Dr. Lutz to testify as a fact witness with respect patient HaHa, for whom he is a treating physician. *Id.*

[443] *Id.*

### 1. Dr. Brobson Lutz

On April 24, 2017, the Government tendered Dr. Brobson Lutz as an expert in the fields of internal medicine and the medical necessity of home health services.[444] Following voir dire, the Court overruled Defendants Henry Evans', Michael Jones' and Gregory Molden's objections and qualified Dr. Lutz as an expert in the fields of internal medicine and the medical necessity of home health services.[445] During his four days of testimony, Dr. Lutz provided expert and, with respect to the one patient he treated, fact testimony regarding whether certain patients' medical records supported a finding of the medical necessity of "homebound" services.

### a. Dr. Lutz Was Properly Certified as an Expert and Allowed to Testify with Respect to Eligibility for Home Health Services

Defendant Henry Evans first argues the Court erred in certifying Dr. Lutz as an expert in the medical necessity of home health services.[446] He argues Dr. Lutz's own testimony proves Dr. Lutz had no special knowledge, training, or expertise that rendered him an expert in the area of certifications for home health.[447] Evans argues Dr. Lutz should not have been permitted to testify as an expert regarding any individual patient's eligibility for home health services because Dr. Lutz never examined or spoke to any of the patients at issue.[448] Instead, Defendant Henry Evans argues Dr. Lutz's "entire body of knowledge . . . consisted only of the records that were provided to him by the

---

[444] R. Doc. 1095.
[445] *Id.* at 36.
[446] R. Doc. 1102-1 at 7.
[447] *Id.*
[448] *Id.* at 5. Defendant Michael Jones also raises this argument in his post-trial motion. R. Doc. 1085-1 at 5. The Court assumes this objection does not apply to Dr. Lutz's testimony with respect to patient HaHa.

Government."[449] Henry Evans also argues that Dr. Lutz's definition of "homebound" under the Medicare regulations was incorrect.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[450]

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[451] provides the analytical framework for determining whether expert testimony is admissible under Rule 702.

Under *Daubert*, courts, as "gatekeepers," are tasked with making a preliminary assessment of whether expert testimony is both relevant and reliable.[452] The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[453]

The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically val*Id.*"[454] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony.[455] "These factors are (1) whether the expert's

---

[449] R. Doc. 1102-1 at 5.
[450] FED. R. EVID. 702.
[451] 509 U.S. 579 (1993).
[452] *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (citing *Daubert*, 509 U.S. at 592–93).
[453] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).
[454] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007); *see also Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).
[455] *Daubert*, 509 U.S. at 592–96.

theory can or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[456]

The Supreme Court has cautioned that the reliability analysis must remain flexible: the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[457] Thus, "not every *Daubert* factor will be applicable in every situation . . . and a court has discretion to consider other factors it deems relevant."[458] The district court is offered broad latitude in making expert testimony determinations.[459]

As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact.[460] "Unless wholly unreliable, the data on which the expert relies goes to the weight and not the admissibility of the expert opinion."[461] Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[462] The Court is not concerned with whether the opinion is correct but whether

---

[456] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).
[457] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).
[458] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004).
[459] *See, e.g.*, *Kumho Tire*, 526 U.S. at 151–53.
[460] *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).
[461] *Rosiere v. Wood Towing, LLC*, No. 07-1265, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)) (emphasis added); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *6 (E.D. Pa. May 4, 2011).
[462] *Pipitone*, 288 F.3d at 250 (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).

the preponderance of the evidence establishes that the opinion is reliable.[463] "It is the role of the adversarial system, not the court, to highlight weak evidence."[464]

The Court did not err in qualifying Dr. Lutz as an expert as to the medical necessity of home health services and allowing him to testify with respect to whether individual patients qualified for home health services. Dr. Lutz testified he had been in private medical practice for nearly 30 years.[465] He received his medical degree as well as a Master's in public health from Tulane University.[466] He also served as Director of Health for the City of New Orleans for over a decade.[467] At trial, the Court determined, based his knowledge, skill, experience, and training that Dr. Lutz was qualified to give opinions in the areas of internal medicine and home health care.[468] The Court gave particular weight to "his experience, that he's been dealing with home health on a daily basis since 1978, that 70 percent of his patients were Medicare beneficiaries, [and] 60 percent African-Americans."[469] The Court also finds that Dr. Lutz had a sufficient basis for the opinions he expressed. In forming his opinions on the eligibility of the patients to receive home health care, Dr. Lutz relied on Medicare billing documents, OASIS forms (completed by the home health nurse), the certifications signed by the physician, and any orders signed by the physician.[470] Dr. Lutz also relied on the certifying physician's patient file, if any existed.[471]

---

[463] *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).
[464] *Primrose*, 382 F.3d at 562.
[465] R. Doc. 1095 at 5.
[466] *Id.*
[467] *Id.* at 6.
[468] *Id.* at 36.
[469] *Id.*
[470] *Id.* at 41.
[471] *Id.*

In reality, Defendant Henry Evans' disagreement seems to be not with Dr. Lutz's qualifications but with the substance of Dr. Lutz's opinion regarding what it means to be "homebound" under Medicare[472] and his opinions with respect to whether individual patient's qualified for home health care.[473] As the Court specifically reminded the parties, the weight and credibility of Dr. Lutz's testimony were proper subjects for cross-examination.[474] The defense had ample opportunity to challenge Dr. Lutz's opinions, and, in fact, Defendant Henry Evans vigorously cross-examined Dr. Lutz on these very issues. This was altogether appropriate, as "[i]t is the role of the adversarial system, not the court, to highlight weak evidence."[475]

The Court did not err in certifying Dr. Lutz as an expert in the areas of internal medicine and the medical necessity of home health services and allowing him to testify about whether individual patients qualified for home health care. Defendants Henry Evans and Michael Jones are not entitled to new trials on this ground and their motions are denied.

### b. Dr. Lutz's Statement Regarding Defendant Michael Jones Did Not Substantially Affect Michael Jones' Rights

Defendant Michael Jones argues that improper testimony of Dr. Lutz substantially affected his Fifth Amendment right to remain silent.[476] During direct examination, the Government asked Dr. Lutz, "How could Dr. Jones have care plan oversight at the highest

---

[472] During cross-examination, Dr. Lutz testified that his definition of "homebound" "is when somebody has an illness where they literally can't get out of the house without doing an ambulance or something, or where it takes an army or a village or something to get them out." R. Doc. 1096 at 216. As the Government correctly notes in its opposition, "Dr. Lutz's statements were never given as restatements of Medicare regulation; instead, Dr. Lutz's statement was an effort to explain to the novice jury his experience in ordering home health." R. Doc. 1147 at 39.

[473] *See generally* R. Doc. 1095.

[474] *Id.* at 27.

[475] *Primrose*, 382 F.3d at 562.

[476] R. Doc. 1085-1 at 10.

level before – when he hasn't seen the patient yet?"[477] In response, Dr. Lutz stated, "Well, he could have been working on information from a nurse practitioner or something. I don't know. That's a good question for Dr. Jones."[478] After this remark, Defendant Michael Jones moved for a mistrial, which the Court denied.[479] Defendant Michael Jones now argues "Dr. Lutz's comments, coupled with the decision by one defendant doctor to testify while Dr. Jones exercised his right to remain silent, are sufficiently erroneous and prejudicial to create a basis for a new trial."[480]

It is well-established that "a prosecutor is prohibited from commenting directly or indirectly on a defendant's failure to testify."[481] However, "not all comments touching on a defendant's decision to remain silent run afoul of the Fifth Amendment."[482] Comments made by a witness about the decision of a defendant not to testify are reviewed in context.[483] "Part of reviewing the remarks in context is determining whether the remark was spontaneous or prompted by the prosecutor."[484] However, "that the prosecution may not have intended that the witness make such a comment neither absolves the sin nor eliminates any potential prejudice."[485] To warrant reversal, the comment must have a clear effect on the jury. "An otherwise impermissible comment will not require reversal if it did not contribute to the jury's verdict beyond a reasonable doubt."[486] Further, "a

---

[477] R. Doc. 1096 at 133.
[478] *Id.*
[479] *See Id.* at 133–35.
[480] R. Doc. 1085-1 at 10.
[481] *United States v. Ramey*, 531 F. App'x 410, 513 (5th Cir. 2013); *see also Griffin v. California*, 380 U.S. 609 (1965).
[482] *United States v. Cervantes*, 706 F.3d 603, 614 (5th Cir. 2013).
[483] *United States v. Velasquez*, 881 F.3d 314, 344 (5th Cir. 2018) (citing *United States v. Rocha*, 916 F.2d 219, 232 (5th Cir. 1990)).
[484] *Id.* (citing *United States v. Moreno*, 185 F.3d 465, 472–73 (5th Cir. 1999)).
[485] *United States v. Espinosa-Cerpa*, 630 F.2d 328, 335 (5th Cir. 1980).
[486] *Cervantes*, 706 F.3d at 614.

67

curative instruction can militate against finding a constitutional violation, or become central to the harmless error analysis."[487]

The Court finds Dr. Lutz's comment did not substantially affect the rights of Michael Jones. First, Dr. Lutz's remark does not rise to the level of a constitutional violation. "The test for determining if a constitutional violation has occurred is whether the language was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."[488] As noted above, the Government asked, "How could Dr. Jones have care plan oversight at the highest level before – when he hasn't seen the patient yet?"[489] In response, Dr. Lutz stated, "Well, he could have been working on information from a nurse practitioner or something. I don't know. That's a good question for Dr. Jones."[490] Although the jury *might* have construed Dr. Lutz's remark as a comment on Michael Jones' failure to testify, it need not *necessarily* have construed it so. Unlike the testimony in *United States v. Velazquez*, where the witness directly invoked the defendant's failure to testify ("I guess your client can get up here and testify. I don't know"), Dr. Lutz's language only tangentially relates to Mr. Jones' failure to testify. As a result, it does not appear the prosecutor "manifestly intended" to draw attention to Mr. Jones' exercise of his Fifth Amendment rights.[491]

Second, the Court immediately provided a strong curative instruction to the jury:

Ladies and gentlemen of the jury, as I will instruct you at the end of the case, the defendants have no obligation to take the stand or testify in this matter based on their right under the Fifth Amendment to the United States Constitution. Their choice not to testify cannot be held against them by you

---

[487] *Velasquez*, 881 F.3d at 344.
[488] *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003).
[489] R. Doc. 1096 at 133.
[490] *Id.*
[491] *Velazquez*, 881 F.3d at 344.

> in any way. Dr. Lutz's statement that something would be a good question for Dr. Jones is stricken from the record and is not to be considered by you in any manner.[492]

In addition, in its final instructions, the Court instructed the jury that "[t]he law does not require a defendant to prove his innocence or produce any evidence at all and no inference whatever may be drawn from the election of a defendant not to testify."[493] The Court also instructed the jury that it may "judge [expert] testimony like any other testimony," and that they "may accept it or reject it and give as much weight as [they] think it deserves."[494]

Third, even if Dr. Lutz's comment violated Michael Jones' constitutional right to remain silent, the Court finds any constitutional violation was harmless. "An error is harmless only if we can determine beyond a reasonable doubt that the improper testimony did not contribute to the jury's verdict."[495] The Court has determined beyond a reasonable doubt that Dr. Lutz's remark did not contribute to the jury's verdict as to Michael Jones. The statement made by Dr. Lutz was "isolated, unsolicited, and never highlighted in the prosecution's subsequent questioning or closing argument."[496] The Court gave a powerful curative instruction that informed the jury the statement was stricken from the record and that it should not considered in any manner. The Court presumes that the jury followed its instruction.[497] And, as explained above, the weight of the evidence supported conviction. This was not a case in which "an inference of guilt from silence [was] stressed to the jury as a basis of conviction."[498]

---

[492] R. Doc. 1096 at 135–36.
[493] R. Doc. 1066 at 3.
[494] *Id.* at 13.
[495] *Velazquez*, 881 F.3d at 344 (quoting *Moreno*, 185 F.3d at 472–73).
[496] *Id.*
[497] *See Zafiro v. United States*, 506 U.S. 523, 540–41 (1993) (holding that juries are presumed to follow instructions given by the court).
[498] *Gongora v. Thaler*, 710 F.3d 267, 278 (5th Cir. 2013).

69

Given the circumstances of Dr. Lutz's comment, the Court's curative instruction, and the weight of the evidence against Defendant Michael Jones, the Court finds any error to be harmless.

### 2.  Leanne Dodson Did Not Testify as to Criminal Intent

On April 27, 2017, the Government tendered and the Court accepted Leanne Dodson as an expert in the field of standards and practices governing documentation and billing of home health care services and Medicare's eligibility requirements for a beneficiary to receive home health services as defined in Chapter 7 of the Medicare Benefit Policy Manual.[499] As explained above, the parameters of Ms. Dodson's testimony were set pre-trial, and the Court expressly precluded Ms. Dodson from giving her opinion as to what conduct constituted fraud.[500]

In his motion for new trial, Defendant Michael Jones argues Ms. Dodson testified about criminal intent and fraudulent conduct, in violation of Rule 704(b) of the Federal Rules of Evidence.[501] Rule 704(b) provides that an expert witness in a criminal case may not offer "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged."[502] Michael Jones does not cite to any specific testimony of Ms. Dodson in which she offers "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged."

The Court finds Ms. Dodson did not impermissibly testify as to any Defendant's criminal intent. Ms. Dodson generally testified as to the documentation and medical

---

[499] R. Doc. 1031.
[500] *See* R. Doc. 832.
[501] R. Doc. 1085-1 at 9.
[502] FED. R. EVID. 704(b); *see United States v. Gutierrez-Farias*, 294 F.3d 657, 662 (5th Cir. 2002).

evidence needed to support a determination that a patient was in need of home health and what clinical medical evidence would be insufficient to support such a determination. At times, Ms. Dodson provided testimony based on her experience as a claims examiner regarding "red flags" that raised her suspicions as to whether a fraud had been committed.[503] However, Ms. Dodson did not express any opinion as to whether any of the Defendants had criminal intent. She did not testify regarding her opinion on the amount of fraud in the health care industry, except to answer questions that required her to do so on cross-examination.

The Court finds Ms. Dodson's testimony did not violate Rule 704(b). Even assuming it did, however, any error in allowing Ms. Dodson to testify was harmless as substantial evidence was presented with respect to each Defendant's criminal intent.[504]

### 3. Dr. Tumulesh Solanky Did Not Testify as to the Defendants' Guilt or Intent to Defraud

On May 2, 2017, the Government tendered and the Court accepted Dr. Tumulesh Solanky as an expert in the field of statistics and probability.[505] Defendant Michael Jones argues Dr. Solanky testified as to the Defendants' guilt and the existence of fraud in violation of Code of Evidence Rule 704(b) by "opin[ing] as to whether the services performed by the defendant doctors were medically necessary."[506] Mr. Jones does not, however, cite to any specific trial testimony by Dr. Solanky that he alleges violates Rule 704(b).

---

[503] R. Doc. 1037 (Minute Entry, Trial, August 28, 2017).
[504] *See Mendoza-Medina*, 346 F.3d at 127 ("Unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required.").
[505] R. Doc. 1476 at 11.
[506] R. Doc. 1085-1 at 11.

Dr. Solanky did not opine on whether any Defendant committed fraud. Instead, he provided a statistical analysis of Medicare billing data and compared the billing statistics from Abide to other national and Louisiana-based home health care providers.[507] At times he discussed the billing data relating to individual Defendants and explained trends in the diagnoses codes used in Abide billings. Although Defendant Michael Jones asserts that Dr. Solanky testified as to the medical necessity of services billed by Abide, it is clear to the Court that Dr. Solanky's testimony was limited to discussing the probability of certain billing phenomena—the appearance of certain diagnosis codes, episodes-per-patient, and the like—in light of Medicare billing data. Each of the Defendants stipulated to the authenticity of this data, and the Court ruled pretrial that the statistical evidence was permissible at trial.[508] At no time did Dr. Solanky testify as to whether the services provided were medically necessary or to the existence of fraud or criminal intent on the part of any Defendant. As a result, Michael Jones' argument is without merit and his motion for a new trial based on this ground is denied.[509]

C.  No Error Was Committed with Respect to Jury Instructions

Several of the Defendants also argue they are entitled to a new trial based on various alleged errors relating to the jury instructions.

---

[507] *Id.* at 12–14.
[508] *See* R. Doc. 881.
[509] Michael Jones also argues that the Court should have instructed the jury not to consider expert testimony expressing an opinion on the Defendants' guilt. However, as the Court finds that no error was committed, no curative instruction was needed.

1.  <u>Instruction on Deliberate Ignorance Was Proper as to Paula Jones and Michael Jones</u>[510]

Michael Jones and Paula Jones both requested new trials based on the Court's alleged error in instructing the jury on deliberate ignorance.[511] Defendant Henry Evans specifically joined in all other objections to jury charges raised by his co-defendants but provided no argument.[512]

In its instructions to the jury, the Court included the following Fifth Circuit Pattern Instruction regarding deliberate ignorance:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his or her eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.[513]

As the Fifth Circuit explained in *United States v. Kuhrt*:

> The proper role of the deliberate ignorance instruction is not as a backup or supplement in a case that hinges on a defendant's actual knowledge. The instruction is appropriate *only* in the circumstances where a defendant "claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." "The evidence at trial must raise two inferences: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposefully contrived to avoid learning of the illegal conduct."[514]

The court "should not instruct the jury on deliberate ignorance when the evidence raises only the inferences that the defendant[s] had actual knowledge or no knowledge at

---

[510] Rule 30 of the Federal Rules of Criminal Procedure states, "Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)." FED. R. CRIM. P. 30(D). "Federal Rule of Criminal Procedure 52(b) states, "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention. While commonly employed by appellate courts, Rule 52 governs disposition of post-trial motions at the district court level." *United States v. Johnson*, No. 13-91, 2017 WL 2531582, at *33 (S.D. W.Va. June 9, 2017).

[511] R. Doc. 1085-1 at 13; R. Doc. 1164 at 22.

[512] R. Doc. 1102-1 at 13.

[513] R. Doc. 1066 at 20 (quoting FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) 1.37A (2015)).

[514] 788 F.3d 403, 417 (quoting *United States v. Brooks*, 681 F.3d 678, 701 (5th Cir. 2012)) (emphasis in original).

all of the facts in question."[515] However, even if an instruction on deliberate ignorance is in error, the Fifth Circuit has explained that such an error "is harmless where there is substantial evidence of actual knowledge."[516]

On September 30, 2016, the parties, pursuant to the Court's Order,[517] filed their proposed jury instructions.[518] In their jointly filed proposed jury instructions, the parties included the Fifth Circuit pattern jury instruction for deliberate ignorance.[519] Defendants Michael Jones and Paula Jones registered no objection to the instruction at that time. Neither one requested an instruction to inform the jury that the instruction may not apply to all Defendants. During the trial, Defendant Paula Jones objected to the inclusion of a deliberate ignorance instruction.[520] The Court is not aware of any objection by counsel for Michael Jones prior to the filing of the Rule 33 motion. The Court notes that objections to jury instructions that were not timely raised are subject to plain error review under Federal Rule of Criminal Procedure 52(b).[521] Defendants Shelton Barnes, Henry Evans, Gregory Molden, and Jonathon Nora did not object and did not file motions for new trial on this ground.[522]

---

[515] *Id.* (alterations in original) (citations omitted).

[516] *Id.* (citing *United States v. St. Junius*, 739 F.3d 193, 204–05 (5th Cir. 2013)).

[517] R. Doc. 730.

[518] R. Doc. 739.

[519] *Id.* at 2.

[520] R. Doc. 1049. Counsel for Paula Jones objected on the record on May 4, 2017.

[521] *See United States v. Fairley*, 880 F.3d 198, 208 (5th Cir. 2018). Rule 30 of the Federal Rules of Criminal Procedure states, "Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)." FED. R. CRIM. P. 30(d). "Federal Rule of Criminal Procedure 52(b) states, "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention. While commonly employed by appellate courts, Rule 52 governs disposition of post-trial motions at the district court level." *Johnson*, 2017 WL 2531582, at *33.

[522] Counsel for Defendant Evans stated on the record that he was "indifferent" with respect to the instruction, and counsel for Defendant Barnes reached an agreement with the Government that he would not oppose an instruction on deliberate ignorance if the Government did not oppose an instruction on good faith.

Paula Jones argues she never stated "she *did not know* about her salary being an illegal kickback to her husband," but instead, "consistently argued that her salary *was not an illegal kickback at all*."[523] Similarly, Defendant Michael Jones argues the Court erred in giving a deliberate ignorance instruction because he never claimed a lack of guilty knowledge.[524] Instead, Defendant Michael Jones argues he "consistently maintained his lack of guilt altogether.[525]

With respect to Defendant Paula Jones, the Court finds providing the jury an instruction on deliberate ignorance was not in error. First, contrary to her assertions, Paula Jones did in fact argue that she did not have guilty knowledge of the criminal scheme. Her requested summary of defense instruction, which was not given by the Court, stated she "merely processed such documentation with no reason to believe it to be false or fraudulent. She is the mere recipient of salary checks for her services, and had no reason to believe that any portion of her salary was a kickback as alleged by the Government."[526] In his opening statement, counsel for Paula Jones asserted she was unaware of the true reason for her salary increase, as "Paula [was] not even part of that conversation." Further, during closing argument, Paula Jones' counsel argued "there's a reasonable basis for her to believe in her mind she is not doing anything wrong."[527] Accordingly, it is clear that Paula Jones "claim[ed] a lack of guilty knowledge."[528]

Second, the evidence at trial supports an inference that "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct, and (2) the

---

[523] R. Doc. 1164 at 22–23 (emphasis in original).
[524] *See* R. Doc. 1085-1 at 13.
[525] *Id.*
[526] R. Doc. 756.
[527] R. Doc. 1125 at 13.
[528] *United States v. Nguyen*, 493 F.3d 613, 618 (5th Cir. 2007).

defendant purposely contrived to avoid learning of the illegal conduct."[529] Evidence was introduced at trial that Paula Jones was initially hired by Lisa Crinel at a salary of $45,000.[530] A few months later, Paula Jones' salary was doubled.[531] There was testimony at trial that this increase in salary had nothing to do with a change in circumstances or an addition of any work duties.[532] No evidence was introduced that the promotion was related to any change to Paula Jones' responsibilities, title, or part-time work schedule. Instead, testimony at trial demonstrated that the doubling of Paula Jones' salary was the result of an in-kind kickback paid by Lisa Crinel and Abide in return for Michael Jones sending more referrals to Abide.[533] Lisa Crinel testified that when she approached Paula Jones to express her frustration with Michael Jones' failure to send the promised number of referrals, Paula Jones told Crinel, "That's between you and Michael and I'm not going to get involved in that."[534] This testimony supports an inference that Paula Jones was (1) subjectively aware of a high probability of illegal conduct, and (2) purposefully contrived to avoid learning of the illegal conduct. As a result, the deliberate ignorance instruction was appropriate.

Even if the instruction on deliberate ignorance was improper, the Court finds the error was harmless. Giving an instruction on deliberate ignorance "constitutes harmless error where substantial evidence of actual knowledge exists."[535] Wilneisha Jakes testified the kickback arrangement was explained to Ms. Jones in person at a meeting between

---

[529] *Mendoza-Medina*, 346 F.3d at 132.
[530] R. Doc. 1015 at 163.
[531] R. Doc. 1108 at 242.
[532] R. Doc. 1015 at 170–75.
[533] *Id.*
[534] R. Doc. 1108 at 253
[535] *United States v. Boutte*, 13 F.3d 855, 859 (5th Cir. 1994).

Jakes, Lisa Crinel, and Paula Jones.[536] Lisa Crinel testified that when she approached Paula Jones to express her frustration with Michael Jones' failure to send the promised number of referrals, Paula Jones told Crinel, "That's between you and Michael and I'm not going to get involved in that."[537] The substantial evidence of Ms. Jones' actual knowledge of the fraudulent scheme renders the deliberate ignorance instruction harmless error.

With respect to Defendant Michael Jones, the Court first notes he also advanced the defense that he lacked the requisite guilty knowledge. Michael Jones' pretrial summary of his theory of defense, filed on October 7, 2016, states, "At no time did Dr. Jones know, or have reason to know, that Lisa Crinel or the employees of her company Abide were violating Medicare rules and committing fraud and theft against the Medicare program."[538] The Court also notes Michael Jones did not request that the jury be instructed the charge may not apply to all defendants. As the Fifth Circuit has held, although a defendant may request that the deliberate indifference instruction be limited to the single defendant for whom the evidence supports it, it is not error for the trial court to fail to restrict the instruction. [539]

Furthermore, the Court finds that any potential error it may have made in providing the jury with an instruction on deliberate ignorance is harmless with respect to Michael Jones because the Government presented ample evidence of his actual

---

[536] R. Doc. 1015 at 172–73.
[537] R. Doc. 1108 at 253.
[538] R. Doc. 755 at 1.
[539] *United States v. Bieganowski*, 313 F.3d 264 (5th Cir. 2002) (discussing *United States v. Reissig*, 186 F.3d 617, 619 (5th Cir. 1999)).

knowledge of the criminal activity.[540] Lisa Crinel testified that she and Michael Jones had multiple conversations specifically for the purpose of negotiating a kickback relationship for his referrals to Abide.[541] Larry Taylor testified that Mr. Jones pressured Taylor to send more patients to Abide.[542] Taylor also testified that he drove a van owned and insured by Mr. Jones to pick up Mr. Jones' patients, but that Taylor was paid by Crinel.[543] As a result, even if the Court erred in submitting the deliberate ignorance instruction to the jury, that error was harmless.

Defendants Paula Jones' and Michael Jones' motions for new trial based on the deliberate ignorance instruction given to the jury are denied.[544]

### 2. Excluding Medicare Regulations from the Instructions Was Not Error

Defendant Shelton Barnes argues the Court erred in failing to give the jury his Special Instructions 4–16 and 19,[545] which concern Medicare regulations relevant to this case.[546] The source material for the special instructions requested by Shelton Barnes is the Medicare Benefits Policy Manual, Chapter 7[547] and other regulations that were admitted into evidence.[548] Defendant Henry Evans joined in the objection, particularly noting the Court's failure to provide the definition of "homebound" in the jury instructions.[549] Specifically, Barnes and Evans assert the Court should have instructed the

---

[540] *United States v. Mendoza-Medina*, 346 F.3d at 135 ("[A]n error in giving the deliberate ignorance instruction is harmless where there is substantial evidence of actual knowledge." (quoting *United States v. Saucedo–Munoz*, 307 F.3d 344, 349 n.5 (5th Cir. 2002)).

[541] *See* R. Doc. 1108 at 234.

[542] R. Doc. 1045 at 34 ("[Jones] was telling me about times where Lisa wasn't—didn't think she was getting enough patients, and I needed to schedule . . . more health fairs.").

[543] *Id.* at 28–31.

[544] To the extent Henry Evans joined in the objection, his motion for new trial on this ground also is denied.

[545] R. Doc. 739 at 30–64, 71–72.

[546] R. Doc. 1074-1 at 15–22.

[547] Trial Exh. 103.

[548] *See* Trial Exhs. 100, 101, 4021, 4022.

[549] R. Doc. 1102-1 at 12.

jury on the definition of "homebound" found in the regulations in order to correct alleged errors in the expert testimony of Dr. Lutz and Ms. Dodson.[550]

The Court finds that it was not in error when it excluded the Defendants' proposed instructions regarding Medicare regulations. First, the regulations reiterated in the proposed instructions were admitted into evidence without objection and provided to the jury.[551] Mr. Barnes placed special emphasis on the importance of the exceptions found in 42 C.F.R. 411.354[552] and the safe harbor and exemption from anti-kickback prosecution in 42 C.F.R. 1001.952.[553] The Court allowed the Defendants to place these regulations into evidence as court exhibits and to provide them to the jury,[554] even though the Defendants had failed to list them as trial exhibits.[555] On May 2, 2017, the Court informed defense counsel that they would be allowed to argue to the jury in closing that the Defendants followed the regulations in good faith, so long as the regulations in question had been introduced into evidence.[556] In fact, counsel for Mr. Barnes referenced Exhibits 4021, 4022, and Court Exhibit 15 in closing to support his argument that his client's conduct fit within certain exemptions and safe harbor exceptions from the rules.[557]

Second, the Court was particularly concerned about committing error by instructing the jury on the meaning of the Medicare regulations in a criminal trial. In *United States v. Christo*, the Fifth Circuit reversed a conviction because the trial court instructed the jury on regulatory violations in a criminal case involving checking account

---

[550] *See Id.*
[551] *See* Trial Exhs. 100, 101, 103, 4021, 4022.
[552] Court Exh. 14.
[553] Court Exh. 15.
[554] R. Doc. 1468 at 5.
[555] R. Docs. 1063, 1064.
[556] R. Doc. 1467 at 4.
[557] R. Doc. 1141 at 27–28.

overdrafts, thereby "impermissibly infect[ing] the very purposes for which the trial was being conduct[ed]."[558] The Fifth Circuit in *Christo* was critical of the district court's jury instructions overall, stating "the trial court's instructions and emphasis on [a banking regulation] served only to compound the error by improperly focusing the jury's attention to the [regulatory] prohibitions."[559] The Fifth Circuit's concern is that, by "boostrap[ping]" the defendant's regulatory violations into the jury instructions, a district court could allow a jury to convict a defendant on the basis of regulatory violations, rather than on violations of the statutory crimes alleged in the indictment.[560]

Defendant Shelton Barnes argues that *Christo* does not preclude an instruction on the regulations in this case because it is the Defendants, not the Government, who moved for the introduction of the instructions regarding the regulations. The Court, appreciating the possible distinction, requested that the Defendants provide case law in support of their argument.[561] After the Defendants failed to present the Court with cases in support of their position,[562] and after the Court conducted its own research on the issue, the Court determined that instructing the jury on civil regulations in a criminal case could result in reversible error.

In the end, Mr. Barnes' main complaint seems to be that only the Court could inform the jury of the substance of the regulations with sufficient gravitas and that, as a result, it was error for the Court not to include them in the jury instructions.[563] The Court

---

[558] 614 F.2d 486, 492 (5th Cir. 1980).
[559] *Id.*
[560] *Id.* ("[O]ne questions whether Christo was found guilty of willful misapplication with intent to injure and defraud the bank or whether he was given eighteen concurrent 5-year sentences and fined $90,000 for overdrafting his checking account.").
[561] R. Doc. 1096 at 125.
[562] R. Docs. 1038, 1039, 1040; *see also* R. Doc. 1035.
[563] According to Barnes, the "Court's leadership" was needed on these points; the Court needed "to step in and tell the jury what the rule is under these regulations"; and "the necessity for the Court to explain [the regulations] to the jury, cannot be overstated." R. Doc. 1074-1 at 16–18.

does not agree, especially in light of the fact that the regulations were in evidence, witnesses testified extensively about them, and the Defendants were notified that they were free to argue the regulations in closing. All that is required of the jury instructions is that they (1) correctly state the law; (2) clearly instruct the jurors; and (3) be factually supportable.[564] District courts "enjoy substantial latitude in formulating a jury charge."[565] A district court abuses its discretion by failing to issue a defendant's requested instruction if the instruction "(1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense."[566] The Court allowed the Medicare regulations to be admitted into evidence and provided to the jury and informed the parties that they would be allowed to argue the regulations in closing. As a result, the failure to give the instruction did not seriously impair the defendants' ability to present effectively a defense based on the exceptions and exemptions found in the regulations, and any error in failing to instruct the jury was, therefore, harmless.[567] Shelton Barnes' motion for a new trial on this ground is denied.[568]

### 3. Excluding the Defendants' Requested Theory of the Case Instructions Was Not in Error

Defendants Shelton Barnes and Paula Jones argue the Court erred in declining to provide the jury their respective requested theory-of-defense instructions.[569] On June 21, 2016, well before the trial, the Court allowed the Defendants to file a joint proposed

---

[564] *Fairley*, 880 F.3d at 208.
[565] *United States v. Webster*, 162 F.3d 308, 321–22 (5th Cir. 1998).
[566] *United States v. Bennett*, 874 F.3d 236, 242–43 (5th Cir. 2017).
[567] *United States v. Sanjar*, 876 F.3d 725 (5th Cir. 2017) (Courts of appeals "review the propriety of jury instructions for abuse of discretion, subject again to a harmless error analysis").
[568] To the extent Henry Evans joined in the objection, his motion for new trial on this ground also is denied.
[569] R. Docs. 1074-1 at 18, 1087-1 at 9.

summary of their defense.[570] To the extent the Defendants could not agree on a single, concise theory, the Court allowed Defendants to include theories specific to each Defendant.[571] The Defendants filed individual theories on October 7, 2016.[572] Finding the Defendants' submissions not in accordance with Fifth Circuit jurisprudence, the Court allowed the Defendants to submit revised theory-of-defense instructions they wished to be read to the jury.[573] Defendants Michael Jones, Shelton Barnes, Gregory Molden, Henry Evans, and Paula Jones submitted revised proposals.[574] The Government objected to the Court including these submissions in the jury instructions, and the Court ruled in open court that it would not instruct the jury using the Defendants' revised versions. The Court did include a shorter theory-of-the-defense instruction as to each Defendant in the final jury instructions.[575] As to Defendants Shelton Barnes, Henry Evans, Michael Jones, and Gregory Molden, these instructions stated that each defendant advanced the defense he "acted in good faith and did not have criminal intent when certifying patients for home health care."[576] As to Defendants Paula Jones and Jonathan Nora, the instructions stated that each defendant advanced the theory, among others, "that the Government has failed to meet its burden of proving [the defendant] guilty beyond a reasonable doubt."[577] The Court separately instructed the jury on good faith as a defense to the crime of health care fraud.[578]

---

[570] R. Doc. 576.
[571] *Id.*
[572] R. Docs. 754, 755, 756.
[573] *See, e.g.*, R. Doc. 743 at 2.
[574] *See* R. Docs. 1034, 1040, 1041, 1042, 1057, 1058.
[575] R. Doc. 1066 at 45−46.
[576] *Id.* at 45.
[577] *Id.* at 45−46.
[578] *Id.* at 44.

The Fifth Circuit has explained, "Our cases do not hold [that] a defendant is entitled to a judicial narration of his version of the facts, even though such narrative is, in one sense of the phrase, a 'theory of the defense.'"[579] The Fifth Circuit has further explained, "One of the main purposes of the jury charge is to provide a framework for the argument by counsel. Thus, to determine whether the trial court's refusal to give a requested jury instruction violates a defendant's due process right to a fair trial, the charge must be examined in the full context of the trial including the final arguments of counsel."[580]

A defendant is "entitled to a separate instruction specifically charging the jury on his theory of defense if that theory has legal and evidentiary foundation."[581] However, the Fifth Circuit has recognized the important difference between instructions regarding a "legally cognizable defense," such as the lack of requisite criminal intent, and a defendant's requested instruction amounting to a "judicial narrative of his version of the facts."[582]

Paula Jones requested two alternate theory of the defense instructions. Her first theory of defense read:

> Paula Jones is charged in Counts 1 and 2 of the Indictment related to kickbacks, she is not charged in Counts 3 through 46 regarding alleged healthcare fraud. The government's proof does not even allege that she was involved in a conspiracy in the time period of 2008 to mid-2012.
> Paula Jones denies that her salary increase was a kickback to her, and that she had no such agreement with Lisa Crinel or anyone else. Upon her return to New Orleans post-Katrina, she approached Lisa Crinel for a part-time contractor job, but Lisa rejected that concept in favor of the $45,000.00 salary with the understanding that she could return to her prior

---

[579] *United States v. Stanley*, 765 F.2d 1224, 1236 (5th Cir. 1985) (quoting *United States v. Barham*, 595 F.2d 231, 244 (5th Cir. 1979)).

[580] *Id.* (citing *United States v. Fooladi*, 746 F.2d 1027, 1030 (5th Cir. 1984); *United States v. Gray*, 751 F.2d 733, 735–36 (5th Cir. 1985)).

[581] *United States v. Washington*, 688 F.2d 953, 957 (5th Cir. 1982) (citations omitted).

[582] *See United States v. Lance*, 853 F.2d 1177, 1184–85 (5th Cir. 1988).

salary level after the completion of her medical recovery, as she was able to take on additional responsibilities, including implementation of Kennser (sic) software, additional Human Resources responsibilities, all of which led to necessity to pay for increased child care cost as she worked longer hours. Paula Jones was under the reasonable belief that her increased salary was related to her prior salary level, her work experience, education, along with the additional responsibilities and longer hours commencing in May 2013. Paula Jones submits that her explanation of her increase in salary is consistent with her plea of not guilty.[583]

Ms. Jones' second theory of the defense read:

Paula Jones is only charged in Counts 1 and 2 of the Indictment related to a kickback in the form of a salary increase. Paula Jones denies that her salary increase was a kickback to her or her husband, and that she had no such agreement with Lisa Crinel or anyone else. She is not charged in Counts 3 through 46 regarding alleged healthcare fraud. The government's proof does not even allege that she was involved in a conspiracy at any time prior to May 2013.[584]

It is clear that both versions of the instruction requested by Paula Jones were merely recitations of the counts of the indictment and narratives of her version of the facts. The Court instead instructed the jury, "Defendant Paula Jones has advanced the defense, among others, that the Government has failed to meet its burden of proving her guilty beyond a reasonable doubt."[585]

Shelton Barnes requested a seven-page theory of the defense instruction.[586] The instruction he requested is largely a paraphrasing of the Medicare regulations, with a light sprinkling of his version of the facts. Instead, the Court ultimately gave the instruction, "Defendant Shelton Barnes has advanced the defense, among others, that he acted in good faith and did not have criminal intent when certifying patients for home health care."[587]

---

[583] R. Doc. 1057 at 1.
[584] R. Doc. 1058.
[585] R. Doc. 1066 at 45.
[586] R. Doc. 1040.
[587] R. Doc. 1066 at 45.

The Defendants' proposed theory-of-the-case instructions were mainly "judicial narrative[s] of their version of the facts," and not legally cognizable defenses, and they had no right to have them included in the jury instructions. To the extent Barnes complains that his theory-of-the-case instruction did not include the Medicare regulations, the Court has noted elsewhere that Exhibits 100, 101, 4021, 4022, Court Exhibit 14, and Court Exhibit 15 were admitted into evidence and provided to the jury and defense counsel were informed at least twice that they would be allowed to argue the impact of the regulations to the jury.[588] The Defendants were given ample opportunity to present their theories of the case to the jury.

"A central purpose of the [theory-of-the-case instruction] is to provide the framework for the argument by the counsel."[589] As a result, the Fifth Circuit has reversed convictions when the court "failed to charge the jury at all on a central element of the defense, or gave an instruction that thwarted a proper defense theory," because in such cases, "defense counsel would have no skeleton on which to structure their argument to the jury."[590] In this case, however, as explained above, the Defendants had ample opportunities to explain and argue their theories of the case to the jury. Accordingly, the Court finds that it was not in error when it refused to include the Defendants' proposed theories-of-defense in the jury instructions. Defendants Shelton Barnes and Paula Jones motions for new trial on this ground are denied.[591]

---

[588] *See supra* Section II.C.2; R. Docs. 1467, 1468.
[589] *Fooladi*, 746 F.2d at 1030.
[590] *Id.* (collecting cases).
[591] To the extent Henry Evans joined in the objection, his motion for new trial on this ground also is denied.

**D.  If There Were Errors in Closing Arguments, They Did Not Affect the Substantial Rights of the Accused**

The Defendants, in their post-trial motions, raise a number of arguments regarding errors made during closing arguments. The two general categories of arguments raised by the Defendants relate to (1) improper comments by the prosecution during its closing statement; and (2) the Court's exclusion of defense arguments during closing.

**1.  Comments by the Prosecution During Its Closing Statement, Even If Improper, Did Not Affect the Substantial Rights of the Accused**

Defendant Shelton Barnes objects to three statements made by the Government in its closing statement: (1) the Government's reference to the Defendant doctors as "elite"; (2) the Government's attacks on the integrity and credibility of defense counsel; and (3) the Government's statement that Lisa Crinel "picked" the doctors as co-conspirators.[592] Defendant Paula Jones specifically objects to the following three statements made by the Government in its closing statements: (1) the Government's "verbal shot" at all of the defense attorneys;[593] (2) the Government's "direct personal attacks at Ms. Jones' defense attorney, Richard Simmons";[594] and (3) the Government's unconstitutional religious reference when discussing the use of the "911 code" at Abide's office.[595]

The Court will first consider the Government's comments to which Mr. Barnes objects. During closing argument, counsel for Paula Jones made comments comparing the reliability of the expert testimony of Dr. Brobson Lutz, who counsel stated "goes to Galatoire's," with the judgment of the doctor Defendants who "know their patients" and who "go down to the areas of the city that need it."[596] In response to this statement, as

---

[592] R. Doc. 1168 at 6–7.
[593] R. Doc. 1087-1 at 14.
[594] R. Doc. 1119 at 19.
[595] *Id.* at 20.
[596] R. Doc. 1125 at 11.

well as the arguments of other counsel challenging Dr. Lutz's credibility, the Government argued in rebuttal:

> [Dr. Lutz] is not an elitist. He worked for the City of New Orleans when these defendants, these elite defendants probably weren't even out of medical school. He worked for the City of New Orleans in home health for the inner city. So that's offensive that this man can't go out and have a martini at a place he said he did. Well, he won't because these defense attorneys are there.[597]

Mr. Barnes argues that referring to the doctors as "elite" was offensive, and that the Government wrongfully implied that defense counsel drink alcohol. Mr. Barnes asserts: "It was shocking, especially without reprimand by the Court, for the United States government to make such a claim, publicly, without apology, and without correction by the Court."[598]

Mr. Barnes also objects to the statement by the Government that Lisa Crinel "picked" the doctors as conspirators. Mr. Barnes maintains that, because Crinel testified there "was no conspiracy," it is logically impossible for the doctors to be co-conspirators.[599]

The Fifth Circuit has explained, "A prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that may be drawn from that evidence."[600] In reviewing a prosecutor's closing arguments, courts in this circuit follow two steps: "First, we . . . initially decide whether or not the prosecutor made an improper remark."[601] "Second, '[i]f an improper remark was made,

---

[597] R. Doc. 1103 at 3.
[598] R. Doc. 1168 at 6.
[599] *Id.* at 7.
[600] *United States v. McCann*, 613 F.3d 486, 495 (5th Cir. 2010) (quoting *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009)).
[601] *Id.* (quoting *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999)) (alteration in original).

we must then evaluate whether the remark affected the substantial rights of the defendant."[602] In determining whether the remark affected the substantial rights of the defendant, the Fifth Circuit has explained that pertinent factors in this analysis include (1) the magnitude of the prejudicial effect, (2) the efficacy of any cautionary instructions, and (3) the strength of the evidence of the defendant's guilt.[603] Further, "In assessing whether statements made by a prosecutor were improper, it is necessary to look at them in context."[604]

With regard to the Government's rebuttal comments on the "elite" status of the Defendants and the temperance of defense counsel, the Court finds that the comments were improper. As defense counsel made clear in their objections raised at the time and in the post-trial motions and supplemental briefings, the Government's statement that defense counsel eat lunch at Galatoire's was not based on properly admitted evidence and was factually incorrect, at least with respect to counsel for Shelton Barnes and Jonathan Nora.[605]

Nonetheless, the Court finds the remarks did not impact the substantial rights of the Defendants. A reviewing court must "consider [] a prosecutor's closing argument as a whole and in the context of a trial."[606] Considering the rebuttal in context, it is clear that the Government was responding to defense counsel for Paula Jones' closing argument. The remark on the "elite" status of the Defendants was clearly a response to the Paula Jones' attacks on Dr. Lutz's socio-economic status. Similarly, the Government's comments regarding defense counsel going to Galatoire's were made in direct response

---

[602] *Id.* (quoting *Gallardo-Trapero*, 185 F.3d at 320).
[603] *See United States v. McPhee*, 731 F.2d 1150, 1152 (5th Cir. 1984).
[604] *Gallardo-Trapero*, 185 F.3d at 320.
[605] *See, e.g.*, R. Doc. 1168 at 6.
[606] *United States v. Boyd*, 773 F.3d 637, 645 (5th Cir. 2014).

to arguments and comments made by defense counsel during trial and closing arguments. In a closing argument, a prosecutor "may [] present what amounts to be a bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon [her] witnesses."[607] Defense counsel opened a door by attacking Dr. Lutz's credibility by accusing him of "go[ing] to Galatoire's," while the Defendants who "know their patients" "go down to the areas of the city that need it."[608] The Government was entitled to respond in order to repair Dr. Lutz's credibility.

However, the Government did commit error when it impugned the credibility and professionalism of defense counsel during rebuttal. There was no legitimate reason for the Government to argue, "that's offensive that [Dr. Lutz] can't go out and have a martini at a place he said he did. Well, he won't because these defense attorneys are there."[609] The Court did not admonish the Government in front of the jury or otherwise issue a curative instruction at the time, which weighs in favor of Mr. Barnes. As explained above in Section I, the jury was presented with abundant evidence of Mr. Barnes' guilt. As a result, it strains credulity to argue that this offhand comment—a few seconds in a four-week trial—had a prejudicial impact on Shelton Barnes' substantial rights.[610]

With regard to the Government's comments in rebuttal that Crinel "picked" the doctors as co-conspirators, the Court finds that the remark was not improper. The Government argued, "Lisa Crinel? She was the leader of this conspiracy. Good grief. I did impeach my own witness. I didn't pick her. They did. They picked her or she picked

---

[607] *United States v. Munoz*, 150 F.3d 401, 415 (5th Cir. 1998).
[608] R. Doc. 1125 at 11.
[609] R. Doc. 1103 at 3.
[610] *Munoz*, 150 F.3d at 415. The Court notes that the barbed exchanges between defense counsel and the Government during closing arguments were unnecessary and an overreaction on the part of all counsel.

them."[611] As explained above, the Government presented substantial evidence that a conspiracy existed between Crinel and the doctor Defendants.[612]

In closing arguments, a prosecutor may discuss "properly admitted evidence and any reasonable inferences or conclusions that may be drawn from that evidence."[613] As a result, it was permissible for the Government to draw the inference that Crinel selected the doctors with the intent of furthering the fraud.

Paula Jones objects to the following statement made by the Prosecution during closing:

> Let's talk about Paula Jones, the lady who had a 911 code with Eartha Ringo in case something happened. Yeah, that's what God-fearing law-abiding citizens do, huh?[614]

In support of its argument that the comment was not improper, the Government cites *Jackson v. Epps*.[615] In *Jackson*, the Northern District of Mississippi explained, "prosecutorial argument that does not interject religious reference as the authority or law by which the jury is to make its decision does not run afoul of the United States Constitution."[616] In other words, not all religious comments made by the Government during trial or closing arguments violate the Constitution. The Government's comments regarding Paula Jones differ from the comments at issue in *Jackson*. In *Jackson*, the

---

[611] R. Doc. 1103 at 10.

[612] The Defendants make much of Lisa Crinel's statement during cross-examination that "[she] never thought [she] had a conspiracy going on." R. Doc. 1046 at 48. However, on direct examination, Crinel described in detail the arrangements between her and each of the doctors, as explained in Section I. Taking Crinel's testimony as a whole, the Court gives little weight to Crinel's statement that "[she] never thought [she] had a conspiracy going on."

[613] *McCann*, 613 F.3d at 495 (quoting *Vargas*, 580 F.3d at 278).

[614] R. Doc. 1103 at 13. The Court also finds the same reasoning applies to Defendant Paula Jones' argument regarding the Government's use of the term "disenfranchised business." *See Id.* at 65–66.

[615] No. 03-461, 2010 WL 3853158 (N.D. Miss. Sept. 28, 2010), *aff'd*, 447 F. App'x 535 (5th Cir. 2011); *see* R. Doc. 1147 at 64–65.

[616] *Jackson*, 2010 WL 3853158, at *29 (citing *Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998) (rejecting claim that prosecutor's closing mentioning Bible amounted to reversible error)).

prosecutor used a Bible story as an analogy in its closing argument.[617] In this case, by contrast, the Government made a passing reference to what "God-fearing law-abiding citizens do." The Government did not directly reference Defendant Paula Jones' religious devotion, and did not make "an endorsement of extrajudicial authority for imposing a sentence."[618]

Notwithstanding the issue of whether the Government's comment was improper, the Court finds that the Defendant has failed to demonstrate direct prejudice resulting from the remark. In considering the context in which the comment was made, it is clear that the Government's purpose in discussing the evidence of the 911 code was to argue that the mere existence of the 911 code between Paula Jones and Eartha Ringo was evidence of guilt. Directly following the comment at issue, the Prosecutor argued, "Do y'all have 911 codes for when the police come to your door? I think that's a little odd, don't you?"[619] Given this context, Paula Jones has failed to demonstrate that religion was impr0perly injected by the single use of the term "G0d-fearing."

Defendant Paula Jones has failed to show these comments affected her substantial rights. Accordingly, her argument regarding the Government's closing statements referencing religion is without merit and her motion for a new trial on this basis is denied.[620]

---

[617] *Id.*
[618] *Id.*
[619] R. Doc. 1103 at 13.
[620] With respect to Defendant Shelton Barnes' argument that the Government's assertion during closing arguments that "Lisa picked" the Defendants was improper in light of Lisa Crinel's testimony that there was never a conspiracy, the Court has already considered this argument and rejected it. *See* the Court's discussion *supra* notes 599–82.

## 2. <u>The Court's Exclusion of Defense Arguments During Closing Argument Did Not Affect the Substantial Rights of the Accused</u>

Defendant Paula Jones argues the Court improperly and unfairly precluded her from raising certain arguments during closing argument.[621] Specifically, Defendant Paula Jones argues the Court refused to allow her to argue she "was merely indicted as a part of a concocted 'kickback scheme' that was part of a pressure play to have Dr. Jones plead guilty."[622] Ms. Jones relies on the plea arrangement offered to Lisa Crinel, in which the Government agreed to dismiss the charges against Wilneisha Jakes in exchange for Crinel's plea of guilty. Defendant Paula Jones argues that her relationship with Michael Jones is similar to that between Lisa Crinel and Wilneisha Jakes, which suggests "that Ms. Jones was indicted for the purpose of putting pressure on Dr. Jones to enter into a plea deal."[623] Defendant Paula Jones argues the Court committed "substantial error" by not allowing her to raise this argument.

In its November 1, 2016 Order and Reasons,[624] the Court responded to the Government's motion to exclude "any and all evidence, references or inferences regarding the imagined motivation of the prosecution, including racial or political motives."[625] The Court deferred ruling on the motion, but, consistent with Federal Rule of Criminal Procedure 12(b)(3)(A), ruled that "[a]rguments regarding selective prosecution must be raised with the Court before trial and should not be presented to the jury."[626] A "selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden

---

[621] R. Doc. 1087-1 at 14–15.
[622] *Id.* at 15.
[623] *Id.*
[624] R. Doc. 833 at 29.
[625] R. Doc. 702-1 at 16.
[626] R. Doc. 833 at 29 (citing FED. R. CRIM. P. 12(b)(3)(A)).

by the Constitution."[627] Paula Jones did not raise a selective prosecution objection pre-trial and, as a result, her motion for new trial amounts to an untimely argument of selective prosecution.

"A district court has broad discretion over the scope of closing arguments."[628] Absent a showing of an abuse of discretion, appellate courts have explained a district court will not be reversed for limiting summation as long as the defendant has the opportunity to make all legally tenable arguments that are supported by the facts of the case.[629] Even if Defendant Paula Jones had timely raised the issue of selective prosecution, the Court finds that she has failed to establish why this is a legally tenable argument supported by the facts introduced into evidence in this case. Accordingly, the Court was not in error when it precluded Defendant Paula Jones from raising an argument of selective prosecution in her closing arguments and her motion for new trial on this ground is denied.

### E.  No Error Was Committed in the Court's Evidentiary Rulings

#### 1. The Court Correctly Excluded Defendant Shelton Barnes' Exhibits 4083, 4084, and 4085

Defendant Shelton Barnes argues the Court erred in not allowing him to introduce Exhibits 4083, 4084, and 4085 into evidence.[630] The exhibits at issue are forms signed by patients KiSt, HaHa and ArGi in which those patients acknowledge they are homebound. Defendant Shelton Barnes argues the Court should have admitted these exhibits into evidence because: (1) they are competent evidence of the patients'

---

[627] *United States v. Armstrong*, 517 U.S. 456, 463 (1996).
[628] *United States v. Gaines*, 690 F.2d 849, 858 (11th Cir. 1982) (citing *United States v. Newman*, 628 F.2d 362, 365–66 (5th Cir. 1980)).
[629] *Id.*
[630] R. Doc. 1074-1 at 14.

homebound status, and (2) the documents could have been used to impeach Dr. Lutz's expert testimony.[631]

The Court finds it properly determined these exhibits were inadmissible hearsay. First, Defendant Shelton Barnes' primary reason to introduce these exhibits was to prove the patients were, in fact, homebound. The patients who purportedly signed these forms did not testify at trial. Thus, the Court properly identified the exhibits as hearsay pursuant to Rule 801 of the Federal Rules of Evidence.

Further, the exhibits do not fall within any exception to the hearsay rule. Rule 803(4) establishes a hearsay exception for statements that are "made for—and [are] reasonably pertinent too—medical diagnosis or treatment; and describe medical history; past or present symptoms or sensations; their inception; or their general cause."[632] This exception is justified by a "patient's strong motivation to be truthful."[633] The exhibits did not fall into the medical records exception in Rule 803(4), however, because an expert in the field would not have been justified in rendering his opinion based on the document.[634] The documents do not "reveal symptoms, objective data, surrounding circumstances or any similar factual data that a reasonable physician would consider relevant in the treatment or even diagnosis of a medical condition."[635] Each of these proffered exhibits only "express a patient's conclusion as the appropriate medical diagnosis—hardly a matter upon which an expert in the field could rely in rendering an opinion."[636] Nor did the exhibits fall under Rules 703 or 705, as Dr. Lutz did not rely on the documents in

---

[631] *Id.*
[632] FED. R. EVID. 803(4).
[633] FED. R. EVID. 803(4) cmt.
[634] *Gong v. Hirsch*, 913 F.2d 1269 (7th Cir. 1990) (discussing 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 803(4) (1988)).
[635] *Id.* at 1274.
[636] *Id.*

forming his opinion, and did not use the documents as underlying facts or data. Finally, the exhibits lacked indicia of trustworthiness sufficient to fall into the residual exception of Rule 807. Proffered exhibit 4083 was signed by Zellisha Dejean, who pleaded guilty to Count 20.[637] Proffered exhibit 4085 was signed by Suprenia Washington, who pleaded guilty to Count 9.[638] Proffered exhibit 4084 was signed by Shawnto Smith, who, although not indicted in this case, the Government represented, without contradiction by the Defendants, was involved in the fraud.[639] Because the nurses who signed the forms either pleaded guilty to health care fraud or were otherwise implicated in the fraud, the documents lack indicia of trustworthiness.

Second, to the extent Defendant Shelton Barnes sought to introduce these exhibits as impeachment evidence, the Court finds that it properly excluded them. Rule 801(d)(1) provides that an out-of-court statement may be used when the declarant testified and is subject to cross-examination, and the statement "is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial hearing, or other proceeding or in a deposition." Mr. Barnes intended to use the exhibits to impeach the credibility of Dr. Lutz, who testified that these patients could not have been homebound. The proffered exhibits were not prior inconsistent statements by Dr. Lutz, and as a result the exhibits would not be admissible to impeach Dr. Lutz's testimony under Rule 801(d)(1).

### 2. The Court Correctly Admitted Evidence Related to Jobie Crear

Defendant Paula Jones argues the Court erred in allowing the Government to introduce testimony regarding the Medicare fraud Jobie Crear committed prior to

---

[637] R. Doc. 597.
[638] R. Doc. 669.
[639] R. Doc. 1479 at 3.

Hurricane Katrina.[640] Prior to trial, the issue of whether to allow the Government to introduce evidence related to Jobie Crear, an unindicted doctor who shortly before trial pleaded guilty to an unrelated charge of conspiracy to pay and receive illegal health care kickbacks,[641] was heavily litigated. During a status conference held on April 10, 2017, the Court issued rulings on a number of motions related to the possible testimony of and evidence related to Jobie Crear.[642] Ultimately, the Court ruled that both Jobie Crear and Lisa Crinel could testify as to their previous financial relationship with each other.[643] The Court found that Rule 404(b) of the Federal Rules of Evidence did not apply because the evidence was intrinsic to the charged conspiracy, ruling:

> With respect to Dr. Jones, Lisa Crinel may testify that Dr. Jones wanted the same arrangement as Dr. Crear, that she paid Dr. Jones' employees and his wife rather than compensating him directly for referrals. She may testify about how Dr. Jones knew about her relationship with Dr. Crear, if she has personal knowledge.[644]

Defendant Paula Jones argues that, despite the Government's pretrial assertion that Michael Jones told Lisa Crinel he wanted to model his kickback scheme after the earlier financial relationship between Jobie Crear and Lisa Crinel, there was no evidence at trial that Michael Jones or Paula Jones ever knew about this earlier kickback arrangement.[645] Defendant Paula Jones specifically argues that the Government misled the Court regarding Lisa Crinel's statements connecting Michael Jones to the kickback arrangement between Jobie Crear and Lisa Crinel and that the Court erred in characterizing the kickback arrangement between Crear and Crinel as intrinsic

---

[640] R. Docs. 1087-1 at 10–11, 1119 at 15–16.
[641] *See United States v. Jobie Crear*, No. 16-cr-214 (E.D. La. Dec. 13. 2016).
[642] *See* R. Doc. 1007.
[643] R. Doc. 1008 at 39, 42.
[644] *Id.* at 39.
[645] R. Doc. 1164 at 12–13.

evidence.[646] Defendant Paula Jones argues that the admission of testimony regarding Crear and Crinel's previous kickback arrangement was not harmless error because it was unfairly prejudicial and it facilitated the improper testimony of Special Agent Bradford.[647] Defendant Paula Jones also argues that the Government made improper comments during closing arguments regarding this arrangement.[648]

At trial, Lisa Crinel testified that during a meeting in a restaurant in New Orleans, she and Michael Jones discussed entering into an agreement whereby Michael Jones would receive in-kind kickbacks in the form of an increase in his wife's salary in exchange for referrals to Abide.[649] Crinel testified that during this conversation Michael Jones told her that he wanted to set up a kickback relationship, and Crinel suggested he was following in the footsteps of Jobie Crier. Specifically, Lisa Crinel stated, "I think I teased him that he was trying to be the next Jobie Crear; but to that extent, that's the only time the name may have come up."[650] Lisa Crinel also testified that Michael Jones told her that, now that he was starting his own practice and "had his own control systems and not under the controls of Dr. Crear," he wanted to enter into a relationship with Crinel and Abide.[651]    Lisa Crinel also testified about the nature of her arrangement with Crear. She explained that, in exchange for Crear sending patients to Abide, Lisa would pay the salaries of several of Crear's employees, including Paula Jones.[652] Crinel further testified that Crear set up a meeting between him, Crinel, and Paula Jones, to help explain the

---

[646] *Id.* at 11–17.
[647] *Id.* at 17–21.
[648] *Id.* at 21–22.
[649] *See* R. Doc. 1108 at 207, 234.
[650] *Id.* at 234.
[651] *Id.*
[652] R. Doc. 1108 at 52–56.

home health care industry, and that after this meeting, Crinel began paying Ms. Jones' salary.[653]

Generally, evidence of other acts is intrinsic "when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined; or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged."[654] The Fifth Circuit has explained, "It is well established that where a conspiracy is charged, acts that are not alleged in the indictment may be admissible as part of the Government's proof."[655] "Evidence is intrinsic to a conspiracy if it is relevant to establish how the conspiracy came about, how it was structured, and how the [defendant] became a member."[656] "This evidence is admissible to complete the story of the crime by proving the immediate context of events in time and place."[657] "Intrinsic evidence does not implicate Rule 404(b), and 'consideration of its admissibility pursuant to Rule 404(b) is unnecessary.'"[658]

Lisa Crinel's testimony about Jobie Crear is intrinsic to the charged conspiracy because it occurred during the pivotal conversation in which Lisa Crinel and Michael Jones discussed Michael Jones' joining the charged conspiracy and concerned how Michael Jones would become a member, and how the conspiracy would work. The introduction of this evidence was not unduly prejudicial to Michael Jones as, in context, it clarifies that Michael Jones understood the meaning behind Lisa Crinel's reference to

---

[653] *Id.* at 56.
[654] *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005) (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)).
[655] *United States v. Watkins*, 591 F.3d 780, 785 (5th Cir. 2009).
[656] *Id.* at 784 (citing *United States v. Nichols*, 750 F.2d 1260, 1265 (5th Cir. 1985)).
[657] *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996).
[658] *Id.* (quoting *United States v. Garcia*, 27 F.3d 1009, 1014 (5th Cir. 1994)).

Jobie Crear. In addition, the introduction of this evidence was not unduly prejudicial to Paula Jones because it also explained how she became involved in the conspiracy.

Defendant Paula Jones also specifically objects to the evidence introduced relating to Jobie Crear based on the testimony of Special Agent Krista Bradford.[659] Defendant Paula Jones argues Special Agent Bradford testified "on numerous occasions that certain conduct by the defendant was a 'kickback,'" and that Special Agent Bradford also stated that Paula Jones' pre-Katrina salary was part of a kickback relationship. Paula Jones argues that such testimony, along with the evidence showing that Paula Jones worked for Jobie Crear at a time when he had an illegal kickback relationship with Lisa Crinel, created the impression that Paula Jones had been a co-conspirator with Crinel for over a decade.[660] After Special Agent Bradford testified, Paula Jones moved for a mistrial and also requested a cautionary instruction, claiming that Special Agent Bradford repeatedly characterized the payments towards her salary as "kickbacks."[661] As the Government correctly recalls, during trial the Court reviewed the "real-time" transcript and determined that Special Agent Bradford almost exclusively used the word "kickback" in response to questions asked during cross examination.[662] The Court ultimately denied the motion for a mistrial and found that a cautionary instruction was not necessary. [663]To prove an error necessitating a new trial, Paula Jones must identify specific statements made by Special Agent Bradford that unfairly prejudiced her right to a fair trial. The testimony of Lisa Crinel and Krista Bradford has been transcribed.[664] Defendant Paula

---

[659] R. Doc. 1087-1 at 13.
[660] *Id.*
[661] *See* R. Doc. 1048 at 2.
[662] R. Doc. 1468 at 7.
[663] *Id.*
[664] R. Docs. 1108, 1109, 1115, 1432, 1433, 1434.

Jones had the opportunity to provide the Court with specific testimony of Special Agent Bradford that violated this right, but she has failed to do so.

Accordingly, the Court finds that it was not in error when it denied Paula Jones' request for a mistrial as a result of the testimony of Special Agent Bradford and denied her request for a cautionary instruction. Paula Jones' motion for new trial on these grounds is denied.

### 3. The Court Correctly Allowed Evidence of Defendant Henry Evans' 1986 Disciplinary Investigation by the Louisiana Board of Medical Examiners

Defendant Henry Evans argues the Court improperly admitted evidence pertaining to his 1986 disciplinary investigation by the Louisiana Board of Medical Examiners.[665] Evans argues the Court's decision to allow the Government to introduce this evidence "was directly contrary to the Court's prior ruling on that issue, rendered in open court on December 20, 2016."[666]

The Court initially ruled that the Government could not introduce evidence of Mr. Evans' 1986 disciplinary investigation pursuant to Rule 404(b) because the disciplinary action was too remote in time and unduly prejudicial.[667] However, after subsequent review, the Court ruled that, if Evans chose to testify, the Government could question him on cross-examination about the 1986 Disciplinary Investigation for the purpose of challenging his character for truthfulness pursuant to Rule 608(b).[668]

In his Reply Memorandum in Support of Motion for Acquittal or New Trial, Evans argues the Court issued its order allowing the Government to introduce this evidence

---

[665] R. Doc. 1166 at 19.
[666] *Id.* (citing R. Doc. 889).
[667] R. Doc. 889 at 17.
[668] R. Doc. 898.

pursuant to Rule 608(b) "without briefing by the parties or opportunity for argument."[669] This assertion is simply incorrect. First, the Court issued its original ruling precluding the Government from introducing this evidence pursuant to Rule 404(b) during oral argument on October 26, 2016.[670] In that hearing, the Government argued Rule 404(b) applied only to its case-in-chief and that it should be allowed to introduce this evidence if Defendant Evans chose to testify.[671] The Court then provided dates for the parties to submit briefings on the issues.[672] On November 7, 2016, the Government filed its memorandum regarding the Application of Federal Rule of Evidence 404(b) to Areas of Trial Other than the Government's Case-In-Chief,[673] and Defendants Henry Evans and Michael Jones filed their responses on November 16, 2016.[674] In addition, the Court heard two hours of oral argument on the issue on December 20, 2016.[675] On February 7, 2017, the Court issued its Order and Reasons in which the Court ruled that, if Evans chose to testify, the Government would be allowed to question him on cross-examination about the 1986 Disciplinary Investigation for the purpose of challenging his character for truthfulness pursuant to Rule 608(b).[676]

Defendant Evans correctly points out that the Government improperly introduced evidence of the 1986 investigation during its case-in-chief.[677] On April 12, 2017, during the questioning of its second witness, Wendy Naquin, the Government introduced and questioned the witness about Exhibit 107, a Medicare Enrollment Application completed

---

[669] R. Doc. 1166 at 20.
[670] R. Doc. 832 at 2.
[671] R. Doc. 881.
[672] *See id.*; R. Doc. 845.
[673] R. Doc. 839.
[674] R. Docs. 854, 858.
[675] R. Doc. 886.
[676] R. Doc. 898.
[677] R. Doc. 1166 at 21.

by Henry Evans.[678] Exhibit 107 included a reference the 1986 disciplinary investigation.[679] After the jury retired for the day, Defendant Evans' counsel pointed out to the Court that Exhibit 107 included evidence of the disciplinary investigation. After admonishing the Government for improperly using an exhibit that contained the excluded information, the Court ordered the Government to redact the inadmissible material from the version of Exhibit 107 that would go the jury.

The 1986 disciplinary investigation was not mentioned again until after Defendant Henry Evans took the stand to testify in his own defense. As Defendant Evans explains in his reply, "In light of the Court's ruling that this information would be admissible on cross-examination and the government['s] obvious intention to confront Dr. Evans with this information, Dr. Evans' counsel raised this matter on direct exam."[680] Defendant Henry Evans reiterates his objection to the Government being allowed to question him on cross examination about the exhibit because the evidence is too remote in time, has no probative value, and is unduly prejudicial. For the reasons explained in its February 7, 2017 Order and Reasons[681] the Court finds that it was not in error to allow the Government to introduce this evidence on cross-examination of Mr. Evans pursuant to Rule 608(b) of the Federal Rules of Evidence.

### F.  No Error Was Committed With Respect to Discovery Violations

Defendant Paula Jones argues the Government committed two discovery violations that warrant a new trial.[682] The alleged discovery violations relate to the

---

[678] R. Doc. 1016 at 4–5.
[679] *Id.*
[680] R. Doc. 1166 at 21–22; *see* Doc. 1100 at 4–5.
[681] R. Doc. 898. Arnold Cano testified that Kinnser Software is an online web application used by home health agencies, including Abide. *See* R. Doc. 1107 at 5.
[682] R. Doc. 1087-1 at 11–12.

Government's production of information regarding co-Defendant Larry Taylor's alleged lies to the grand jury and the Government's failure to produce Paula Jones' notes from a March 2013 seminar and her Kinnser software package information.[683]

### 1. Larry Taylor's Testimony Before the Grand Jury

With respect to the alleged failure to timely disclose and produce Larry Taylor's testimony to the grand jury, Paula Jones argues the Government admitted it had knowledge from Taylor that he lied to the grand jury a full five days before trial, but attempted to "spring the information on the defense during Larry Taylor's direct testimony" two weeks later.[684] Paula Jones argues this information should have been given to the defense before trial, immediately upon its discovery, and that the untimely production "substantially altered the cross examination of Taylor" by counsel for both Michael Jones and Paula Jones.[685] Paula Jones further argues that, although Larry Taylor made favorable comments about Michael Jones to the grand jury, "the defense was forced to forego [sic] this line of questioning to avoid 'opening the door.'"[686]

When the evidence at issue was brought to the Court's attention, the Court ruled from the bench that during his direct examination the Government could not elicit testimony from Larry Taylor that Michael Jones pressured him to lie to the grand jury.[687] The Court reasoned, in part, that the evidence was barred by Rule 404(b) of the Federal Rules of Evidence because it was not timely produced. On April 23, 2017, the Government filed a motion to reconsider.[688] The Government argued this evidence was intrinsic, and

---

[683] *Id.*
[684] *Id.* at 11.
[685] *Id.*
[686] *Id.*
[687] *See* R. Doc. 1021-1 at 1.
[688] *Id.*

not barred by Rule 404(b), because it showed Defendant Michael Jones' consciousness of guilt.[689] The Government also argued that because the information was discovered only five days before trial, it was not memorialized in a report of investigation and, therefore, the Government did not have an obligation to disclose it prior to trial.[690] The Court denied the Government's motion for reconsideration and the Government was precluded from introducing this evidence on direct examination of Michael Jones.

First, Defendant Paula Jones has failed to demonstrate a discovery obligation that was violated by the Government's alleged untimely production. As the Government identifies in its opposition, "Under *Jencks*, the Government had no obligation to disclose the grand jury transcript of Larry Taylor until the close of his direct testimony."[691] To the extent Defendant Paula Jones is alleging a *Giglio*[692] violation, "The Fifth Circuit has held that there is no violation of *Giglio* as long as the evidence is disclosed to the defense before the end of trial."[693]

Second, Paula Jones argues the untimely production, even though the Court ruled the testimony was inadmissible, "substantially altered the cross examination of Taylor," because the defense was unable to introduce the "favorable statements about Dr. Jones [made] to the Grand Jury."[694] However, she has not demonstrated any prejudice to *her* resulting from the late production or the Court's decision. She is not implicated in the statements by Larry Taylor, except to the extent that she is Michael Jones' co-conspirator.

---

[689] *Id.*

[690] *Id.* at 5; *see United States v. Martino*, 648 F.2d 367, 387 (5th Cir. 1981).

[691] R. Doc. 1147 at 58 (citing 18 U.S.C. § 3500(b)). The Government also notes that it did disclose the grand jury transcript of Larry Taylor "well before he testified." *Id.*

[692] *Giglio v. United States*, 405 U.S. 150 (1972).

[693] *Id.* (citing *United States v. Lee*, No. 15-2, 2015 WL 3466011, at *4 (E.D. La. June 1, 2015)); *see also, United States v. Baucum*, 146 F.3d 868, *7 (5th Cir. 1998) ("Under *Brady* and *Giglio*, the defendants were not prejudiced by the government's failure to disclose because they obtained Whitehead's criminal record prior to the end of trial.").

[694] R. Doc. 1087-1 at 11.

In short, Defendant Paula Jones has failed to show any violation of a discovery obligation regarding this evidence and has also failed to show any prejudice to her resulting from either the Court's ruling or the alleged untimely production. Her motion for a new trial on these grounds is denied.

2.  <u>Government's Failure to Produce Paula Jones' "Work Shop Papers"</u>

Defendant Paula Jones argues the Government did not produce her "work shop papers" from a March 2013 seminar until the end of the Government's case, in violation of Rule 16 of the Federal Rules of Criminal Procedure. Paula Jones asserts this affected her decision whether to testify. She also argues the Government failed to timely produce documentation showing her involvement in the Kinnser processing of claims.

Rule 16 provides, "Upon a defendant's request, the Government must disclose to the defendant, and make available for inspection, copying, or photographing . . . any relevant written or recorded statement by the defendant" if the statement is within the Government's possession or control and the attorney for the Government knows, or through the exercise of due diligence could know, that the statement exists.[695] The "work shop papers," which contain Paula Jones' notes from a home health training session, do not appear to contain any information related to this case. Paula Jones does not explain why the "work shop papers" qualify as a "relevant written or recorded statement" under Rule 16, and she cites no case law in support of her position. Accordingly, the Court finds Paula Jones' argument to be without merit.

As to the documents showing her involvement in the Kinnser processing of claims, Ms. Jones has failed to identify the discovery obligations the Government violated with

---

[695] FED. R. CRIM. P. 16(a)(1)(B).

regard to these documents, nor has she shown any prejudice suffered as a result. Ms. Jones' arguments are wholly unsupported, and she is not entitled to a new trial on these grounds.

### G. The Prosecutors' Leading Questions

Defendants Paula Jones and Shelton Barnes argue the Court erred in denying their motions for a mistrial based on the Government's leading questions during direct examination.[696] Defendant Paula Jones specifically objects to the alleged leading questions directed to Special Agent Bradford.[697] In her motion, however, Defendant Paula Jones fails to identify any specific instances of the use of leading questions that had a prejudicial effect on her right to a fair trial.

"If a defendant moves for a mistrial on the grounds that the jury heard prejudicial testimony, 'a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in light of the entire record.'"[698] A mistrial should be ordered "[i]f the 'evidence is so prejudicial that the jury will unlikely be able to erase it from their minds.'"[699] "To determine whether prejudicial testimony should prompt a mistrial," the Fifth Circuit has "focused on the characteristics of the prejudicial evidence and the strength of the other evidence in the case."[700]

With respect to leading questions, "[t]he evil to be avoided is that of supplying a false memory for the witness."[701] Defendant Paula Jones has failed to identify any

---

[696] R. Doc. 1087-1 at 13; R. Doc. 1168 at 5–6.
[697] *Id.*
[698] *United States v. Zamora*, 661 F.3d 200, 211 (5th Cir. 2011) (quoting *United States v. Paul*, 142 F.3d 836, 844 (5th Cir. 1998)).
[699] *Id.* (quoting *United States v. Escamilla*, 666 F.2d 126, 128 (5th Cir. 1982)).
[700] *Id.* (internal citations omitted).
[701] *United States v. Graham*, 643 F. App'x 268, 269 (4th Cir. 2016) (citations omitted).

examples of leading questions that resulted in a potential supplying of a false memory for any witness. Her failure to do so is fatal to her motion for a new trial because, without identifying specific instances of leading questions, Defendant Paula Jones is not able to demonstrate any prejudicial effect.

### H.  No Error Was Committed in Denying Paula Jones' Motion to Sever

Prior to trial, Paula Jones filed a Motion for Severance pursuant to Federal Rules of Criminal Procedure 8(b) and 14(a).[702] She now moves for a new trial on the grounds that the Court erred in denying her repeatedly renewed Motion for Severance.[703]

When, as in this case, an indictment charges multiple defendants and multiple counts, Federal Rule of Criminal Procedure 8(b) governs the propriety of joinder.[704] This rule allows the joinder of defendants in the same indictment if they are alleged to have participated "in the same series of acts or transactions . . . constituting an offense or offenses."[705] Whether the counts charged fulfill this "same series" requirement is determined by the facts in the indictment, which are accepted as true absent arguments of prosecutorial misconduct.[706] There is no requirement that each defendant have participated in the same act(s),[707] or that each defendant be charged in the same count(s).[708]  Rather, Rule 8 is "flexible" and should be broadly construed in favor of joinder.[709] The dispositive inquiry is whether the indictment charges "a series of acts

---

[702] R. Doc. 484.
[703] R. Doc. 1087-1.
[704] *United States v. Kaufman*, 858 F.2d 994, 1003 (5th Cir. 1998).
[705] FED. R. CRIM. P. 8(b).
[706] *See United States v. McRae*, 702 F.3d 806, 820 (5th Cir. 2012); *United States v. Faulkner*, 17 F.3d 745, 758 (5th Cir. 1994). No Defendants have made arguments of prosecutorial misconduct.
[707] *McRae*, 702 F.3d at 820.
[708] FED. R. CRIM. P. 8(b).
[709] *United States v. Butler*, 429 F.3d 140, 146 (5th Cir. 2005). *See also United States v. Bullock*, 71 F.3d 171, 174 (5th Cir. 1995) ("Joinder of charges is the rule rather than the exception and Rule 8 is construed liberally in favor of initial joinder.").

unified by some substantial identity of facts or participants."[710] This link is usually satisfied when an indictment alleges an overarching conspiracy that encompasses the substantive offenses charged.[711] "It is well settled that a charge of conspiracy initially legitimizes joinder of all defendants, as the conspiracy charge provides a 'common link' and demonstrates that the charges arise from or 'grow out of' the same acts or transactions."[712] Even separate conspiracies with different memberships are properly joined if the conspiracies are part of the same series of acts or transactions.[713]

Federal Rule of Criminal Procedure 14(a) provides, "if the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendants or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."[714] The Fifth Circuit recognizes that "circumstances may be presented where the prejudice to a defendant from joinder with a co-defendant(s) in a joint trial overrules the interest in judicial economy."[715]

In Paula Jones' initial Motion for Severance, she contended Counts 1 and 2 of the indictment were improperly joined with Counts 3 through 31 because the facts that underlie Counts 1 and 2 differ from those supporting Counts 3 through 31. Jones further

---

[710] *See McRae*, 702 F.3d at 821 (quoting *United States v. Dennis*, 645 F.2d 517, 520 (5th Cir. 1981)).

[711] *See United States v. Lane*, 735 F.2d 799, 805 (5th Cir. 1984) ("Proof of a common scheme is typically supplied by an overarching conspiracy from which stems each of the substantive counts."); *see also United States v. Krout*, 66 F.3d 1420, 1429 (5th Cir. 1995); *United States v. Ellender*, 947 F.2d 748, 754 ("Joinder of defendants is particularly appropriate when conspiracy is one of the charges."); *United States v. Hundley*, No. 02-441, 2003 WL 21537774, at *2 (S.D.N.Y. July 7, 2013) ("[T]he indictment can also be read as alleging that these defendants were engaged in a broad scheme to enrich themselves and their associates by any fraudulent means required.").

[712] *United States v. Potashnik*, No. 07-289, 2008 WL 5272807, at *5 (N.D. Tex. Dec. 17, 2008) (citations omitted).

[713] *See United States v. Harrelson*, 754 F.2d 1153, 1176–77 (5th Cir. 1985).

[714] FED. R. CRIM. P. 14(a).

[715] *McRae*, 702 F.3d at 821–22.

argued there is "no identity of the participants" in Counts 1 and 2, as compared to Counts 3 through 31.[716] According to Paula Jones, "[w]ith such a variance between the respective sets of counts, it is apparent that the [c]ounts were improperly joined in the Indictment and should be severed."[717] Further, Paula Jones argued that, even if the Court concluded Counts 1 and 2 were properly joined with Counts 3 through 31, severance was warranted under Federal Rule of Criminal Procedure 14(a).[718] Paula Jones argued she was entitled to severance "based on the prejudice which is certain to arise from a joint trial with her co-defendants."[719] Paula Jones' argument was founded on her belief that she would be prejudiced by the "spillover effect" that would result if she were tried alongside her co-defendants.[720]

The Court denied Paula Jones' motion, finding that the conspiracies alleged in Counts 1 and 2, although charged separately from the counts of health care fraud, were "part of a single plan or scheme: i.e., the defrauding of Medicare, a federal health care benefit program."[721] Further, the Court found "[t]he Superseding Indictment makes clear that Paula played an integral part in and helped effectuate the purposes of the conspiracies charged in Counts 1 and 2, conspiracies from which the substantive violations alleged in Counts 3 through 31 arise."[722] The Court concluded that the trials of the counts alleged in the Superseding Indictment were properly joined under Rule 8 of the Federal Rules of Criminal Procedure.[723]

---

[716] R. Doc. 551-1 at 8.
[717] *Id.* at 9.
[718] *Id.*
[719] R. Doc. 551-1 at 9.
[720] R. Doc. 551-1 at 9–11.
[721] R. Doc. 603.
[722] *Id.* at 11.
[723] *Id.* at 12.

The Court also found that severance was not warranted under Rule 14(a).[724] Paula Jones argued that the Government's case against her was based solely on her marriage to a co-defendant, and that the kickbacks she allegedly received were different—and less indicative of criminal intent—than those received by other Defendants. Nevertheless, the Court noted that a quantitative disparity in the evidence against a particular defendant is not sufficient grounds to justify severance. The Court found:

> Paula worked as a biller for Abide and, according to the Government, processed a number [of] fraudulent bills and submitted them to Medicare. The Government contends the "culture of fraud" at Abide was so severe that employees, like Paula, knew or should have known that their activities were part of a conspiracy to defraud Medicare. Regardless of how the fraud was carried out, or the quantitative value of the evidence implicating Paula in the fraud, Paula's role in the conspiracies, as alleged in the Superseding Indictment, is not so different or less culpable as compared to the other defendants such that a joint trial would result in prejudicial spillover.[725]

The Court concluded that a properly tailored jury instruction would remedy any spillover prejudice, and that Jones had not met her "heavy burden" to show prejudice to warrant severance pursuant to Rule 14(a).[726] At trial, the Court instructed the jury that each count of the indictment charged separate counts against one or more Defendants, and that each count should be considered separately and individually.[727]

Paula Jones renewed her 14(a) Motion for Severance on October 14, 2016, after the Government gave notice of its intent to use 404(b) evidence against Defendant Henry Evans.[728] She again moved for severance based on the obstruction of justice charge against Defendant Barnes, arguing that the evidence of obstruction against Barnes in

---

[724] *Id.* at 14.
[725] *Id.* at 15 (citations omitted).
[726] *Id.* at 16 (quoting *United States v. Macias*, No. 08-98, 2009 WL 508719, at *1 (N.D. Tex. Mar. 2, 2009)).
[727] *See* R. Doc. 1066 at 17.
[728] R. Doc. 735.

relation to this charge would prejudice her at trial.[729] The Court denied the Motion, finding that Paula Jones had marshalled no additional arguments that would justify a severance.[730] Paula Jones renewed her Motion for Severance several times during the trial.[731]

Paula Jones now moves for a new trial on the grounds that Counts 1 and 2 of the Second Superseding Indictment should have been severed, and that the Court should have severed her from her co-defendants.[732] She repeats the arguments made in earlier iterations of her motion: first, that the "spillover effect" of the evidence related to the counts of health care fraud prejudiced her at trial, and second, that her co-defendants' "kickback involved a Medical directorship contract with Abide, while the unique alleged kickback for Dr. [Michael] Jones was simply Ms. Jones's raise."[733]

The Court finds no reason to disturb its earlier rulings. It is well-established in the Fifth Circuit that "severance is required on the basis of a disparity in the evidence only in the most *extreme* cases."[734] In her Motion for a New Trial, Paula Jones has failed to demonstrate how any admitted evidence related to Counts 3 through 47 of the Second Superseding Indictment improperly "spilled over" to the Counts on which she was convicted.

Similarly, Paula Jones has neither demonstrated how the denial of her Motion for Severance prejudiced her, nor explained why the Court's limiting instruction was insufficient to cure any prejudice. Rather, Jones relies only the conclusory assertion that

---

[729] R. Doc. 735.
[730] R. Doc. 761.
[731] *See* R. Docs. 1007 at 3, 1011 at 2, 1017 at 2, 1019 at 2, 1037 at 2, 1045 at 48–49, 1049 at 2.
[732] R. Doc. 1087-1.
[733] *Id.* at 9.
[734] *United States v. Rocha*, 916 F.2d at 229 (emphasis in original).

the Court's denial of her Motion to Sever "was a substantial legal error that clearly prejudiced Ms. Jones during the trial."[735] Accordingly, the Court finds that it properly denied Jones' Motion for Severance. Paula Jones' motion for a new trial on this ground is denied.

I.  Cumulative Error Did Not Deprive the Defendants of a Fair Trial

Henry Evans, Michael Jones, and Paula Jones argue that even if any single one of the Court's errors does not warrant a new trial, the cumulative effect of the Court's errors was to deprive them of a fair trial, mandating a new trial.[736] "The cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e. plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for a reversal."[737] The Fifth Circuit has further explained, "[T]he cumulative error doctrine is only to be used in 'rare instances.' Reversal is justified only when errors 'so fatally infect the trial that they violated the trial's fundamental fairness.'"[738] "Allegations of non-errors do not play a role in cumulative error analysis since there is nothing to accumulate."[739] In assessing the cumulative impact of the trial errors, court should "evaluate the number and gravity of the errors in the context of the case as a whole."[740]

To recapitulate, the Court determined the prosecution's remarks during rebuttal were error but harmless error, and that all other allegations of error by the Defendants are meritless. Having rejected the Defendant's arguments concerning the Court's

---

[735] R. Doc. 1087-1 at 9.
[736] *See* R. Doc. 1102-1 at 13; R. Doc. 1085-1 at 15; R. Doc. 1087-1 at 15.
[737] *Munoz*, 150 F.3d at 418 (collecting cases).
[738] *Cervantes*, 706 F.3d at 619 (quoting *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012) (en banc)).
[739] *Id.*
[740] *United States v. Valencia*, 600 F.3d 389, 429 (5th Cir. 2010).

evidentiary rulings, discovery violations, jury instructions, and the failure to sever Paula Jones, the only error to "accumulate" is the prosecution's remark during closing argument. As the Court explained above, this error was harmless. Given the context of the trial as a whole, in light of the weight of the evidence supporting the Defendants' convictions, the Court concludes that the Government's inappropriate comment during rebuttal closing argument did not deprive any Defendant of a fundamentally fair trial.[741] Accordingly, Defendants are not entitled to a new trial based on cumulative error.

## III. Motion to Arrest Judgment

Defendants Shelton Barnes and Gregory Molden move to arrest judgment under Federal Rule of Criminal Procedure 34.[742] A court may grant a motion for arrest of judgment after a verdict or finding of guilty, or after a plea of guilty or nolo contendre.[743] An arrest of judgment must be based on defects apparent from the face of the indictment, and not on evidence adduced at trial.[744] In reviewing a motion for arrest of judgment, "the court may not look beyond the face of the record, and evidence is not part of the record."[745]

Mr. Molden's motion is styled as a "motion for judgment for acquittal, and in the alternative for new trial, and in the further alternative, to arrest judgment."[746] The motion itself does not discuss Rule 34, however, and Mr. Molden does not put forward any arguments in support of a Rule 34 motion to arrest judgment. Accordingly, to the extent Mr. Molden seeks an arrest of judgment, the motion is denied.

---

741 *See Munoz*, 150 F.3d at 418.
742 R. Doc. 1074-1; R. Doc. 1455-1.
743 FED. R. CRIM. P. 34.
744 *See United States v. Sisson*, 399 U.S. 267, 281–82 (1970).
745 JUDGE JAMES CISSELL, FEDERAL CRIMINAL TRIALS, § 13-2, 376–77 (7th ed. 2008).
746 R. Doc. 1455.

Barnes essentially reargues his claim that the Government failed to prove every element of Count 47 beyond a reasonable doubt.[747] Defendant Barnes argues that the Government did not meet its burden of proving an essential jurisdictional element of 18 U.S.C. § 1516, because the Government "failed to prove beyond a reasonable doubt that Barnes received more than $100,000 in any one year period."[748] As the Court previously ruled, however, "[t]he only reasonable interpretation of § 1516 is that $100,000 must be received in any one year period by the program being audited, in this case, Medicare, and not by the defendant accused of obstructing the federal audit."[749] The Court further ruled, "[t]he Government introduced sufficient evidence to sustain Defendant Barnes' conviction under Count 47 of the Second Superseding Indictment."[750] In his renewed motion, Barnes presents no new arguments in support of his motion for arrest of judgment, and the Court sees no reason to revisit its earlier ruling. His motion is denied.

## <u>CONCLUSION</u>

For the foregoing reasons, it is hereby **ORDERED** that (1) Defendant Shelton Barnes' Motion for Judgment of Acquittal and, in the Alternative for New Trial, and in the Further Alternative, to Arrest Judgment[751] is **DENIED**; (2) Defendant Jonathon Nora's Motion for Judgment of Acquittal and, in the Alternative, for New Trial[752] is **DENIED**; (3) Defendant Michael Jones' Renewed Motion for Judgment of Acquittal and/or Motion for New Trial[753] is **DENIED**; (4) Defendant Paula Jones' Motion for Acquittal and, in the

---

[747] R. Doc. 1074-1 at 23.
[748] R. Doc. 1074-1 at 23.
[749] R. Doc. 1078 at 5.
[750] *Id.* at 5–6.
[751] R. Doc. 1074.
[752] R. Doc. 1080.
[753] R. Doc. 1085.

Alternative, Motion for New Trial[754] is **DENIED**; (5) Defendant Henry Evans' Motion for Judgment of Acquittal and Alternatively, Motion for New Trial[755] is **DENIED**; and (6) Defendant Gregory Molden's Motion for Judgment of Acquittal and, in the Alternative for New Trial, and in the Further Alternative, to Arrest Judgment[756] is **DENIED**.

New Orleans, Louisiana, this 27th day of August, 2018.

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[754] R. Doc. 1087.
[755] R. Doc. 1102.
[756] R. Doc. 1455.